# 24-2321-CV

## United States Court of Appeals

*for the*

## Second Circuit

———————————●———————————

DENNIS J. DONOGHUE,

*Plaintiff-Appellant,*

DEBORAH DONOGHUE,

*Plaintiff,*

– v. –

THOMAS GAD,

*Defendant-Appellee,*

Y-MABS THERAPEUTICS, INC.,

*Nominal-Defendant-Appellee.*

———————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

DAVID LOPEZ
LAW OFFICE OF DAVID LOPEZ
171 Edge of Woods Road
P.O. Box 323
Southampton, New York 11968
(631) 287-5520

MIRIAM TAUBER
MIRIAM TAUBER LAW PLLC
885 Park Avenue, Suite 2A
New York, New York 10075
(323) 790-4881

*Attorneys for Plaintiff-Appellant*



(800) 4-APPEAL • (334760)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES    ii

STATEMENT OF JURISDICTION    1

ISSUES PRESENTED    1

STATEMENT OF THE CASE    2

  A.   Background    2

  B.   Procedural History    5

STANDARD OF REVIEW    6

SUMMARY OF ARGUMENT    7

ARGUMENT    9

*POINT I.* GAD'S ACQUISITION OF Y-MABS SHARES
FROM WG BIOTECH WAS A NON-EXEMPT §16(b) PURCHASE    9

A. Gad's Acquisition of Y-mAbs Shares
  From WG Biotech Was a §16(b) Purchase    9

B. The SEC Rule 16a-13 Exemption Is Not Available to Gad's Purchase
  of Y-mAbs Shares From WG Biotech, an Entity Gad Did Not Control    12

*POINT II.* THE EXCLUSION FOR
       "UNORTHODOX TRANSACTIONS" DOES NOT APPLY    20

*POINT III.* THE EXCHANGE CANNOT OTHERWISE BE
       EXCLUDED FROM THE STRICT LIABILITY STATUTE    21

A. *At Home v. Cox* Does Not Support Expanding the "Unorthodox
  Transactions" Exclusion or Removing the Exchange From §16(b)    21

B. The Exchange Presented the Risk of Speculative Abuse    26

CONCLUSION    30

## TABLE OF AUTHORITIES

### Cases

*Allaire Corp. v. Okumus,*
    433 F. 3d 248 (2d Cir. 2006) ................................................................. 26

*At Home Corp. v. Cox Communications, Inc.,*
    446 F. 3d 403 (2d Cir. 2006) ............................................................. 5, 21

*Atlas Air, Inc. v. International Board of Teamsters,*
    943 F. 3d 568 (2d Cir. 2019) ................................................................... 7

*Borley v. United States,*
    22 F. 4th 75 (2d Cir. 2021) ...................................................................... 7

*Champion Home Builders Co. v. Jeffress,*
    385 F. Supp. 245 (E.D. Mich. 1974) ..................................................... 25

*Chechele v. Sperling,*
    758 F.3d 463 (2d Cir. 2014) .............................................................. 26, 27

*Cummings v. Commissioner,*
    506 F.2d 449 (2d Cir. 1974) .................................................................. 12

*DiLorenzo v. Murphy,*
    443 F.3d 224 (2d Cir. 2006) .................................................................. 10

*Donoghue v. Murdock,*
    No. 13 Civ. 1224, 2013 WL 4007565 (S.D.N.Y. Aug. 6, 2013) .......................... 26

*Donoghue v. Smith,*
    No. 21 Civ. 4811, 2022 WL 1225338 (S.D.N.Y. April 26, 2022) ..................... 16

*Donoghue v. Tannenbaum,*
    No. 22-1156, 2023 WL 4631963 (2d Cir July 20, 2023) ..................... 20, 25, 29

*Dreiling v. American Express Co.,* 458 F.3d 942 (9th Cir. 2006) ........................ 25

*Foremost-McKesson, Inc. v. Provident Securities Co.,*
    423 U.S. 232 (1976), ...................................................................... 11, 28

*Huppe v. WPCS International, Inc.*
    670 F. 3d 214 (2d. Cir. 2012). ............................................................... 10

*Jingrong v. Chinese Anti-Cult World Alliance Inc.,*
    16 F. 4th 47 (2d Cir. 2021) ...................................................................... 7

ii

## Cases (continued)

*Kern County Land Co. v. Occidental Petroleum Corp.*,
411 U.S. 582 (1973) ....................................................... 2, 25, 28

*Magma Power Co. v. Dow Chemical Co.*,
136 F. 3d 316 (2d Cir.1998), ...................................... 10, 11, 28

*Mueller v. Korholz*,
449 F. 2d 82 (7th Cir. 1971) .................................................. 25

*Nosirrah Mgmt., LLC v. AutoZone, Inc.*,
No. 24 Civ. 2167, 2024 WL 4804083 (W.D. Tenn. Nov. 15, 2024) .................. 16

*Roth v. Goldman Sachs Group, Inc.*,
740 F.3d 865 (2d Cir. 2014) .................................................. 26

*Schaffer v. CC Investments, LDC*,
280 F. Supp. 2d 128 (S.D.N.Y. 2003), ...................................... 12

*Segen v. Westcliff Capital Management, LLC*,
299 F. Supp. 2d 262 (S.D.N.Y. 2004) .......................................... 11

## Statutes

15 U.S.C. §78p(b). .......................................................... 1, 29

28 U.S.C. §1291 .................................................................. 1

U.C.C. §2-202 ..................................................................... 19

## Rules

17 C.F.R. §240.16a-1 ...................................................... 10, 13, 15

17 C.F.R. §240.16a-9 .......................................................... 12

17 C.F.R. §240.16a-10 ......................................................... 14

17 C.F.R. §240.16a-13 ....................................................... 1, 7, 12

17 C.F.R. §240.16b-1 .......................................................... 11

17 C.F.R. §240.16b-7 .......................................................... 25

iii

**STATEMENT OF JURISDICTION**

This suit is brought under §16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), by Plaintiff, a shareholder of Nominal Defendant Y-mAbs Therapeutics Inc., to recover "short swing" profits realized by Defendant Thomas Gad, the founder and an officer, director, and statutory "insider" of Y-mAbs, as a result of Gad's purchase of Y-mAbs securities from WG Biotech, in exchange for shares of WG Biotech owned by Gad; and his open-market sales of Y-mAbs securities within less than six months before and after the purchase.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291. The District Court issued an Opinion & Order denying Plaintiff's motion for summary judgment and granting summary judgment for Gad, on August 5, 2024 [SPA-1]. Plaintiff's Notice of Appeal was timely filed on August 26, 2024 [A-642.]

**ISSUES PRESENTED**

1. Does the exemption provided by SEC Rule 16a-13, 17 C.F.R. §240.16a-13, for "Changes in Form of Beneficial Ownership" apply to Gad's acquisition of Y-mAbs shares from WG Biotech, an entity over which Gad exercised no investment control?

2. Did the District Court correctly hold that "unorthodox transactions" can be excluded from strict liability under §16(b) and governing SEC Rules based on a discretionary "pragmatic analysis"—even where the requirements of the

1

exclusion developed by this Court and upheld by the Supreme Court in *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973), are not met?

## STATEMENT OF THE CASE

### A. Background

Defendant Thomas Gad is the founder and former CEO of Y-mAbs and does not dispute that he is an "insider" subject to short swing trading restrictions under §16(b). Gad also does not dispute that he sold Y-mAbs stock on dates between October 2020 and June 2021, at the prices reported in his SEC filings and as alleged in the Complaint [A-507]. The dispute in this case concerns whether Gad "purchased" shares of Y-mAbs for purposes of §16(b) in March 2021, within six months of his reported open-market sales, when he acquired over a million Y-mAbs shares held by WG Biotech, a Danish corporation, in exchange for shares of WG Biotech held by Gad's wholly-owned entity Gad Enterprises, LLC, pursuant to an Exchange Agreement in March 2021.

WG Biotech was an entity established by Gad's lifelong friend and fellow Y-mAbs board member Johann Wedell-Wedellsborg ("JWW") for the purpose of holding shares of Y-mAbs initially contributed by the original WG Biotech shareholders—Gad Enterprises, and entities owned and controlled by JWW. The rights of WG Biotech shareholders were governed by the WG Biotech Owners

2

Agreement, which was executed by Gad and JWW in August 2015, before Y-mAbs became a publicly traded company via IPO in September 2018. [SPA-5.]

***JWW was the sole manager of WG Biotech, with exclusive control over the voting and disposition of WG Biotech's investments.*** When WG Biotech was formed, Gad Enterprises owned 36.1% of WG Biotech shares and JWW's Weco entitites held 63.9% of WG Biotech's 100,000 outstanding shares. WG Biotech owned a total of 5,010,000 shares (contributed in the aggregate by Gad Enterprises and the Weco entities), reflecting a ratio of 50.1 Y-mAbs shares owned by WG Biotech for each outstanding share of WG Biotech. Beginning in 2016, there were approximately 25 additional WG Biotech shareholders who had purchased their shares of WG Biotech from Gad Enterprises. [A-596-97; SPA-6 n.4.]

The treasurer of WG Biotech, Oluf Mhyrmann, prepared annual ledgers reflecting the outstanding number of WG Biotech shares, the number of WG Biotech shares held by each WG Biotech shareholder, and the number of Y-mAbs shares owned by WG Biotech. These ledgers reflect that WG Biotech owned 50.1 shares of Y-mAbs for each outstanding share of WG Biotech share until Gad's position in WG Biotech was extinguished by the Exchange. Throughout that time, WG Biotech's only assets were shares of Y-mAbs stock. [SPA-6.]

3

Nonetheless, the WG Biotech Owners Agreement did not require JWW to maintain the ratio of 50.1 Y-mAbs shares for each outstanding WG Biotech share,[1] and did not restrict JWW's authority to sell any Y-mAbs shares held by WG Biotech. The WG Biotech shareholders were not provided with the right to exchange their WG Biortech shares for Y-mAbs shares, or to receive their *pro rata* proceeds from the sale of Y-mAbs shares by WG Biotech. The WG Biotech Owners Agreement provided WG Biotech shareholders with the right to demand a distribution equal to their *pro rata* portion of a total of **one third** of WG Biotech's *annual net profits*. The WG Biotech Owners Agreement also provided WG Biotech shareholders with certain rights to purchase **WG Biotech** shares offered for sale by the other WG Biotech shareholders. [A-598.]

In July 2019, JWW caused one of his wholly owned Weco entities to enter into agreements with all of the minority WG Biotech shareholders other than Gad Enterprises (the WG Biotech "Smallholders"), which provided for the WG Smallholders to exchange each of their WG Biotech shares for 50.1 shares of Y-mAbs separately held by Weco. Gad was not offered the opportunity to participate in exchange offered to the Smallholders. [SPA-8.]

---

[1] This ratio was maintained at JWW's discretion; for example, when he determined to have WG Biotech issue additional WG Biotech shares in exchange for additional Y-mAbs shares contributed to WG Biotech by Weco. [SPA-7.]

4

A year and a half later, in March 2021, JWW caused WG Biotech to enter into the Exchange with Gad at issue in this case, pursuant to which Gad exchanged each of his WG Biotech shares for 50.1 shares of Y-mAbs held by WG Biotech. The Exchange closed on March 10, 2021, at a reported price of $35.30 per share, which was the closing market trading price of Y-mAbs stock on that date. [SPA-9].

## B. Procedural History

The District Court initially denied Defendant's motion to dismiss in an Opinion & Order dated August 8, 2022, because the WG Biotech Owners Agreement and shareholder ledgers relied on by the Defendant were not properly before the court [A-16.1]. Following discovery, Plaintiff and Defendant filed cross-motions for summary judgment. The District Court's Opinion & Order dated August 5, 2024, denied Plaintiff's motion and granted Defendant's motion and entered judgment in Gad's favor.

The District Court held that even though the criteria established by *Kern County* for "unorthodox transactions" were not satisfied, the Exchange could nonetheless be excluded from §16(b) and applicable SEC Rules under the District Court's reading of this Court's decision in *At Home Corp. v. Cox Communications, Inc.,* 446 F. 3d 403 (2d Cir. 2006), because the District Court found that the transaction otherwise presented no opportunity for speculative abuse. In concluding

5

that the Exchange was not within the scope of §16(b), the District Court found persuasive that WG Biotech consistently allocated 50.1 of the Y-mAbs shares comprising WG Biotech's sole assets for every 1 outstanding share of WG Biotech (a ratio reflected in the WG Biotech Shareholder Registers, in the Weco-"Smallholder" transaction, and in the Exchange), and that Gad had consistently reported his *pro rata* interest in the Y-mAbs shares held by WG Biotech on his SEC Form 4 filings.

The District Court alternatively held that the Exchange was exempt under SEC Rule 16a-13 as a "*Change in Form of Beneficial Ownership.*" 17 C.F.R. §240.16a-13. The District Court recognized that the exemption only if applied if Gad was the "beneficial owner" of Y-mAbs shares held by WG Biotech prior to the Exchange, which SEC Rules define to require Gad to exercise "investment control" over WG Biotech. The WG Biotech Owners Agreement provided JWW with sole discretion to manage WG Biotech's portfolio. The District Court's finding that Gad exercised any control over WG Biotech's investments [SPA-42] was based on a misreading of the plain and unambiguous terms of the governing WG Biotech Owners Agreement.

## STANDARD OF REVIEW

The Second Circuit applies a *de novo* standard of review to the District Court's order denying Plaintiff's motion for summary judgment and granting

summary judgment for the Defendant. *See, e.g., Borley v. U.S.*, 22 F. 4th 75, 78 (2d Cir. 2021) ("We review a district court's grant of summary judgment *de novo"); see also Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F. 4th 47, 56 (2d Cir. 2021) ("We review a district court's grant of summary judgment *de novo* where the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other") (quoting *Atlas Air, Inc. v. Int'l Bd. of Teamsters*, 943 F. 3d 568, 576-77 (2d Cir. 2019).

## SUMMARY OF ARGUMENT

The Gad Exchange was a §16(b) purchase by Gad of the Y-mAbs shares acquired by his wholly owned and controlled entity Gad Enterprises, LLC, in exchange for WG Biotech shares. No exemption is available.

The exemption provided by SEC Rule 16a-13, 17 C.F.R. §240.16a-13, does not apply to Gad's acquisition of Y-mAbs shares from WG Biotech. The exemption applies to transactions that effect "only a change in form of beneficial ownership without changing the insider's pecuniary interest in the subject securities." *Id.* Gad was not the "beneficial owner" of the Y-mAbs shares held by WG Biotech because he had no "pecuniary interest" in the shares as defined by applicable SEC Rules prior to the Exchange, as Gad exercised no investment control over WG Biotech. The right to buy or sell Y-mAbs shares on behalf of WG Biotech was vested exclusively with JWW, as the sole manager of WG Biotech. Gad

7

acquired "beneficial ownership" of and a "pecuniary interest" in the shares pursuant to the Exchange, when he acquired the right to sell and the opportunity to profit from any future sale of the Y-mAbs shares that were previously held by WG Biotech and could be sold only as directed by JWW.

Moreover, the *amount* of Gad's "pecuniary interest" in WG Biotech's Y-mAbs shares as a shareholder of WG Biotech, i.e., his opportunity to profit from any sale of WG Biotech's Y-mAbs shares directed by JWW, was limited to the distribution rights provided to WG Biotech shareholders of their pro rata share of up to 1/3 of WG Biotech's total annual profits. Following the Exchange, Gad had the opportunity to realize 100% of the proceeds from the sale of the Y-mAbs shares acquired in the Exchange. Because the Exchange changed the "amount" of Gad's pecuniary interest, in addition to the "fact" of his pecuniary interest and defined "beneficial ownership," the Exchange was not a transaction that effected "only a change in form of beneficial ownership without a change to pecuniary interest," and does not qualify for the Rule 16a-13 exemption.

The "unorthodox transaction" exclusion from §16(b) only applies to transactions that are: (1) involuntary; and (2) where the insider has no access to information. As the District Court recognized, the Exchange does not meet either of these criteria. The Exchange was a voluntary agreement freely entered into and negotiated by Gad, who had access to non-public information about Y-mAbs as the

8

company's CEO. The Exchange cannot otherwise be excluded from the scope of the strict liability statute and governing SEC Rules.

The reasons that convinced the Court to remove the Exchange from the statute do not mitigate the concern for speculative abuse targeted by §16(b). The fact that the ratio of Y-mAbs shares to outstanding WG Biotech shares was dictated or controlled by JWW as the manager of WG Biotech and remained constant while Gad was a WG Biotech shareholder does not eliminate the speculative opportunity that arose when Gad acquired the right to sell and profit from the Y-mAbs shares that were previously owned by WG Biotech and controlled by JWW. Gad's voluntary reporting of his *pro rata* interest in shares held by WG Biotech, which were not within his "beneficial ownership" as defined for purposes of §16, does not provide Gad with a §16(b) exclusion or an excuse to engage in proscribe short swing trading when he purchased the shares from WG Biotech.

## ARGUMENT

### POINT I.   GAD'S ACQUISITION OF Y-MABS SHARES FROM WG BIOTECH WAS A NON-EXEMPT §16(b) PURCHASE

#### A.   Gad's Acquisition of Y-mAbs Shares From WG Biotech Was a §16(b) Purchase

§16(b) is a remedial, strict liability provision intended to deter insiders from taking short term, speculative positions in company stocks by requiring the

9

disgorgement of all profits from "any purchase and sale (or sale and purchase")" by an insider within a period of less than six months. 15 U.S.C. §78p(b).

The District Court correctly stated at the outset of the Opinion:

> The Exchange Act defines a "purchase" (for the purposes of §16(b) and otherwise) to "include any contract to buy, purchase, or otherwise acquire." *DiLorenzo v. Murphy,* 443 F.3d 224, 227 (2d Cir. 2006) (quoting 15 U.S.C. §78c(a)(13)). This definition is a "broad" one, and "may be applied not only to routine cash purchases and sales, but also to acquisitions and dispositions of equity securities in transactions such as conversions, options, stock warrants, and reclassifications." *Huppe v. WPCS Internat'l, Inc.* 670 F. 3d 214, 218 (2d. Cir. 2012). [SPA-20-21].

Although §16(b) operates as a "blunt instrument," *Magma Power Co. v. Dow Chem. Co.,* 136 F. 3d 316, 321 (2d Cir.1998), the statute provides: "This subsection shall not be construed to cover any … transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U.S.C. §78p(b).

The SEC has promulgated an extensive set of "rules and regulations," including Rules specifying various non "routine" or non-cash transactions that are subject to and excluded from §16, and a set of further exemptions from §16(b) for transactions meeting specified requirements. *See generally* SEC Rule 16a-1, *et. seq.*, 17 C.F.R. §240.16a-1 (rules subjecting and exempting certain transactions from both §16(a) reporting and §16(b) liability, including Rule 16a-7 (distributions), Rule 16a-8 (trusts), Rule 16a-9 (*pro rata* rights)); *see also* SEC Rule 16b-1 *et. seq.*, 17 C.F.R.

10

§240.16b-1 ("*Exemption of Certain Transactions from §16(b),* including Rule 16b-3 (transactions between an issuer and an officer/director), Rule 16b-7 ("*Mergers, Reclassifications, and Consolidations*")).

The "harsh result" of the "strict prophylactic rule" imposed by §16(b) on statutory "insiders" who are presumed to trade from a position of superior access and influence, *Foremost-McKesson, Inc. v. Provident Secs Co.*, 423 U.S. 232, 252 (1976), is counterbalanced by the simplicity of avoiding liability by following the SEC's Rules—or, if in doubt as to whether an exemption applies, by avoiding all trading within six months of any questionable transaction in keeping with the statutory "bright line" rule.

As this Court has noted, strict liability under §16(b) is the "price of easy administration" of the statute. *Magma Power,* 136 F. 3d at 320–21 (internal quotation omitted); *see also Segen v. Westcliff Cap. Mgmt.*, LLC, 299 F. Supp. 2d 262, 267–68 (S.D.N.Y. 2004) ("Rather than require a fact-finder to determine whether confidential information was actually used in any one case, Congress crafted §16(b) as a 'crude rule-of-thumb' that establishes a bright line rule against such trading") (quoting Senate Comm. on Banking & Currency, Stock Exch. Practices, S. Rep. No. 1455, 73rd Cong., 2d Sess. 6557 (1934); *Magma Power*, 136 F. 3d at 320–21 (§16(b) "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt

11

the letter of the prohibition"); *Cummings v. Comm'r*, 506 F.2d 449, 452 (2d Cir. 1974) (describing §16 as "a placid inlet in the chaotic sea of securities law—a statute designed for easy application"); *Schaffer v. CC Invs., LDC,* 280 F. Supp. 2d 128, 133–34 (S.D.N.Y. 2003), reconsideration granted in part, No. 99 Civ. 2821(VM), 2003 WL 22480052 (S.D.N.Y. Oct. 31, 2003) ("as designed, §16(b) is not open to much interpretation or debate; it imposes a brand of strict liability")).

The SEC Rule that Gad claims, and the District Court incorrectly held, exempts his purchase of Y-mAbs shares from WG Biotech is Rule 16a-13, 17 C.F.R. §240.16a-13.[2] The exemption provided by that Rule applies to transactions that effect only a "Change in *Form* of Beneficial Ownership." *Id*. (emphasis added). As discussed below, the exemption does not apply.

**B.    The SEC Rule 16a-13 Exemption Is Not Available to Gad's Purchase of Y-mAbs Shares From WG Biotech, an Entity Gad Did Not Control.**

SEC Rule 16a-13, 17 C.F.R. §240.16a-13, provides:

> "Change in Form of Beneficial Ownership. A transaction, other than the exercise or conversion of a derivative security or deposit into or withdrawal from a voting trust, **that effects *only* a change in the *form* of beneficial ownership *without changing a person's pecuniary interest* in the subject securities shall be exempt** from §16 of the Act." (Emphasis added).

---

[2]    Gad initially asserted an additional defense based on the exemption provided by SEC Rule 16a-9, 17 C.F.R. §240.16a-9 (pertaining to "*pro rata* distributions"), which was subsequently withdrawn. [SPA-34 n.14.]

12

The exemption is expressly limited to transactions that "only change the *form of **beneficial ownership*** **without changing a person's __pecuniary interest__** in the subject securities." As the District Court recognized, the exemption provided by SEC Rule 16a-13 only applies if Gad was the "beneficial owner" of, and had the same "pecuniary interest" in, the securities, before and after the transaction alleged as a purchase. [SPA-35.]

"Beneficial ownership" and "pecuniary interest" are terms defined by SEC Rule 16a- 1, 17 C.F.R. §240.16a-1:

For purposes of computing whether a shareholder is subject to §16 as a 10% "beneficial owner" of company's equity securities, "beneficial ownership" is defined to include securities within the shareholder's investment and voting control. *See* SEC Rule 16a-1(a)(1) (incorporating the definition applicable under §13(d)).

For all other purposes under §16 (i.e., for purposes of compliance with 16(a) disclosure and 16(b) short swing trading restrictions), "beneficial ownership" is defined to include securities in which an insider has a "pecuniary interest," i.e., "the opportunity, directly or indirectly, to profit or share in any profit from a transaction in the subject securities." *See* SEC Rule 16a-1(a)(2), 17 C.F.R. §240.16a-1; *see generally* SEC Release No. 34-28869 ("Ownership Reports & Trading by Officers, Directors & Principal Security Holders") (Feb. 21, 1991), 1991 WL 292000 at §II.B.

13

The definition of "pecuniary interest" under SEC Rule 16a-1 is further expanded to include and exclude specific types of interests. In various situations where securities are held indirectly, e.g, through a trust, partnership, or corporation, the Rules provide that shares are included within the definition of "pecuniary interest," and by extension, the insider's "beneficial ownership" for §16 reporting and compliance purposes, ***only where the shares are within the insider's investment control.*** *See* SEC Rules 16a-1(a)(2)(iii) (corporations); Rule 16a-8 (trusts), 17 C.F.R. §§240.16a-1, 16a-8.

The SEC Rule 16a-13 exemption applies to transfers of shares that only effect a change in form of "beneficial ownership." For example, a transfer to an insider by an entity wholly owned and controlled by the insider (e.g., Gad Enterprises LLC, which was wholly owned and controlled by Gad) would only change the insider's "form of beneficial ownership" from indirect to direct and would qualify for the Rule 16a-13 exemption from §16(a) reporting and §16(b) liability, *see* SEC Rule 16a-10, 17 C.F.R. §240.16a-10 (providing that transactions that are not reportable under §16(a) do not trigger §16(b) liability). But to qualify for the exemption, the shares must already be attributed to the insider—i.e., within the insider's "beneficial ownership," further defined as "pecuniary interest"—before the transaction. [SPA-35.]

14

The exemption does not apply in this case because Gad did not have a "pecuniary interest" as defined by SEC Rules in the Y-mAbs shares held by WG Biotech before he purchased the shares in exchange for the WG Biotech shares owned by Gad Enterprises. As a shareholder of WG Biotech prior to the Exchange, Gad's indirect interest in Y-mAbs shares held in WG Biotech's portfolio was governed by Rule 16a-1(a)(2)(iii), 17 C.F.R. §240.16a-1, which provides:

> "A shareholder shall **not be deemed to have a pecuniary interest in the portfolio securities held by a corporation or similar entity** in which the person owns securities **if the shareholder is not a controlling shareholder of the entity and does not have or share investment control over the entity's portfolio**." (Emphasis added).

WG Biotech was a corporation managed exclusively by JWW. Gad was not a controlling shareholder of WG Biotech and exercised no investment control and no right to exercise any investment control over WG Biotech's portfolio. As defined by SEC Rules, Gad did not have a "pecuniary interest" in the shares and was not a "beneficial owner" of any Y-mAbs shares in WG Biotech's portfolio shares for purposes of §16(b). Gad acquired a defined "pecuniary interest" in and became the "beneficial owner" of the Y-mAbs shares that he purchased from WG Biotech pursuant to the Exchange. The Exchange increased Gad's beneficial ownership of and pecuniary interest in Y-mAbs shares—or changed both "the fact and amount of Gad's pecuniary interest"—and was not an exempt transaction under Rule 16a-13.

15

Courts have performed this analysis when evaluating whether a transfer from a trust to an insider was exempt as a change in form of beneficial ownership only under Rule 16a-13. The courts have looked to the similar definition of "pecuniary interest" applicable to trusts, which excludes an interest in shares held by a trust if the insider is not a trustee and does not otherwise exercise investment control over the trust. If the insider does not exercise investment control over the trust, shares held by the trust are not attributed to the insider for purposes of §16— i.e., the trust shares are not within the insider's defined "pecuniary interest" and "beneficial ownership" under applicable Rules—and transfers of shares between the trust and the insider are not exempt under Rule 16a-13. *See Donoghue v. Smith,* No. 21 Civ. 4811, 2022 WL 1225338, at **4-5 (S.D.N.Y. April 26, 2022) (availability of Rule 16a-13 exemption for insider's acquisition of shares from trust depended on whether insider exercised investment control and thus had a pecuniary interest in the trust shares under SEC Rule 16a-8); *see also Nosirrah Mgmt., LLC v. AutoZone, Inc.*, No. 24 Civ. 2167, 2024 WL 4804083, at **2-4 (W.D. Tenn. Nov. 15, 2024) (availability of Rule 16a-13 exemption to transfer from trust to insider depended on insider's "beneficial ownership" of and "pecuniary interest" in shares owned by the trust).

The District Court in this case likewise recognized that the claimed exemption applied only if Gad had a "pecuniary interest" in the Y-mAbs securities

16

held by WG Biotech before the Exchange, and that the relevant definition of "pecuniary interest" required the District Court to find that Gad exercised investment control over WG Biotech's portfolio [SPA-35]. But the District Court's finding that Gad exercised investment control over WG Biotech's investment portfolio is contrary to the clear and express terms of the governing WG Biotech Owners Agreement.

The District Court enumerated certain rights supposedly reflecting the investment control retained by WG Biotech shareholders. The rights listed by the District Court, e.g., right of first refusal, etc., relate to shares of WG Biotech—and *not to "WG Biotech's portfolio" shares,* i.e., shares of Y-mAbs owned by WG Biotech. [*See* SPA-35; *compare* SPA-598.] The right to manage WG Biotech's portfolio securities was vested exclusively and entirely with JWW as sole manager, who had the sole discretion to sell any of WG Biotech's Y-mAbs shares to anyone at any time.

The District Court also misstates the terms of the WG Biotech Owners Agreement in referencing the right of WG Biotech shareholders to a distribution equivalent to their *pro rata* portion of the proceeds from any sale of WG Biotech's portfolio securities, i.e., Y-mAbs shares. The distribution right provided to WG Biotech Shareholders was the right to a distribution of their *pro rata* portion of a total of 1/3 of WG Biotech's *total annual profits.*

17

The District Court first conflates the right to a distribution of a portion of _annual corporate profits_ (which would include the proceeds of any sale of portfolio securities only to the extent that JWW as the manager of WG Biotech, determined to sell shares on behalf of WG Biotech, reduced by overhead, salaries, and other corporate expenses, and determined on a net basis after the close of the fiscal year); with the right to demand a portion of the _proceeds of WG Biotech's securities transactions,_ which was a right not granted to WG Biotech shareholders. [_See_ SPA-598.]

The District Court also overlooks that WG Biotech's shareholders' distribution rights were limited to _one-third_ of WG Biotech's _total annual profits._ [_Compare_ SPA-6; SPA-40.] Even putting aside the crucial distinction between annual profits and sale proceeds (and disregarding that any sale of WG Biotech's portfolio securities would only be made at JWW's discretion), Gad's outright purchase of the shares from WG Biotech in the Exchange nonetheless, _and at a minimum,_ increased the _amount_ of Gad's pecuniary interest in the shares by increasing his opportunity to profit _**from 1/3 to 100%**_ of the proceeds from any future sale of the shares (which could subsequently be made at Gad's sole discretion).

More fundamentally, Gad had no control over WG Biotech's investment portfolio, which was managed exclusively by JWW, under the unambiguous terms of the WG Biotech Owners Agreement, which are

18

mischaracterized in the Opinion. To the extent the District Court cited witness testimony that likewise misstate the terms of the governing agreement, those assertions should have been disregarded as inadmissible parole evidence, *see generally* U.C.C. §2-202. The text of the WG Biotech Shareholders Agreement speaks for itself and summary judgment should be granted for the Plaintiff. Any evidence in conflict with the terms of the governing agreement, if admitted, at most creates a question of fact warranting reversal of the order granting summary judgment for Gad.

But the District Court held that summary judgment should be granted for Gad before even reaching the question of whether the exemption provided by SEC Rule 16a-13 applied to the Exchange. As an initial and alternative basis for granting Gad's motion and denying Plaintiff's motion, the District Court held that Gad's purchase of shares from WG Biotech was not subject to §16(b), *irrespective of any exemption provided by SEC Rules*, because the District Court determined that the transaction did not present the risk of speculative abuse targeted by the statute. [SPA-20.]

As further discussed below, the §16(b) exclusion for "unorthodox transactions" does not apply to the Exchange. There is no basis for excluding the Exchange from the statute for any other reason, including the reasons given by the

19

District Court, which do not mitigate the concern for speculative abuse targeted by §16(b).

## POINT II.  THE EXCLUSION FOR "UNORTHODOX TRANSACTIONS" DOES NOT APPLY

The District Court held that the Exchange was not subject to the statute or governing SEC Rules requirements based on a "pragmatic analysis," which the District Court stated was permissible because the Exchange was not a cash for stock transaction clearly within the scope of the statute. [SPA-20.] The "pragmatic analysis" developed by this Circuit and upheld by the Supreme Court for "unorthodox" or "borderline" transactions provides a narrow exclusion for transactions that do not raise the specter of abuse targeted by §16(b).

There are two requirements for the "unorthodox transaction" exclusion to apply, which the District Court correctly recites: (1) the transaction must be involuntary or forced upon the insider; and (2) the insider must have no access to non-public information. As this Court recently confirmed, both requirements of the "narrow" exclusion are the insider's burden to prove. *See Donoghue v. Tannenbaum*, No. 22-1156, 2023 WL 4631963, at *4 (2d Cir. July 20, 2023).

The District Court also correctly held that the exclusion is unavailable to Gad, who was then the CEO of Y-mAbs, the ultimate corporate insider who cannot claim lack of access to non-public information.

20

But once the District Court determined that the "unorthodox" or "borderline" exclusion did not apply, the District Court took a sharp turn away from precedent by moving on to ask, "whether the [Exchange] presented a risk of insider speculation so as to fall within the scope of 16(b)'s strict liability," and evaluating whether Gad "could have manipulated the terms of the Exchange to his advantage."

The requirements of the unorthodox transaction exclusion are the criteria that determine whether a transaction does not present the risk of speculation targeted by §16(b). There is nothing in the case law that permits the District Court to otherwise exclude Gad's purchase of Y-mAbs shares from WG Biotech from the strict liability statute, and nothing excuses Gad from complying with the proscription against short swing trading by avoiding selling shares within six months of the purchase.

## POINT III. THE EXCHANGE CANNOT OTHERWISE BE EXCLUDED FROM THE STRICT LIABILITY STATUTE

### A. *At Home v. Cox* Does Not Support Expanding the "Unorthodox Transactions" Exclusion or Removing the Exchange From §16(b)

The District Court incorrectly derived the authority to look beyond the "unorthodox transaction" requirements for a basis to exclude the Exchange from 16(b) before applying SEC Rules from this Court's decision in *At Home Corp. v. Cox Communications, Inc.*, 446 F. 3d 406 (2d Cir. 2006).

21

*At Home* involved a high-speed internet company in which Comcast held more than 10% beneficial ownership. Comcast was granted a put option, or right to sell At Home shares to AT&T, which was the largest shareholder of At Home. The Court confirmed that the put option granted to Comcast was treated as the sale of underlying shares by Comcast under §16(b) pursuant to SEC Rule 16b-6. The question the Court addressed was whether Comcast "purchased shares of At Home by acquiring three cable systems whose assets included warrants to purchase At Home stock." *Id.* at 406.

In *At Home*, as the District Court describes, the Court first held that the "unorthodox transaction" exclusion did not apply to Comcast's acquisition of the cable companies, because Comcast was a "typical" statutory insider, as a 10% shareholder in a position of superior market influence and corporae access. *See id.* at 406 ("*Kern County* controls when the insider is atypical as well as the transaction").

The Court's finding that Comcast's acquisition of the cable companies nonetheless did not constitute a matchable §16(b) purchase of the warrants owned by those companies was based entirely on the Court's observation that Comcast's acquisition of the cable companies was a $10 billion transaction, and only a "small fraction" of the purchase price paid by Comcast could notionally be attributed to the warrants. *Id.* at 409. Because Comcast's acquisition of the At Home warrants was

22

not the purpose—or even a significant component of—Comcast's acquisition of the cable companies, the Court concluded that it would not be reasonable to characterize the acquisitions as a purchase of the warrants for §16(b) purposes. Given that the warrants held in the portfolios of the acquired cable companies were tangential to the M&A transactions, enforcement of §16(b) would not serve deter short swing trading in that context or serve the remedial statutory purpose.

The Court expressly stated that the holding of *At Home* would not apply to a case where shares of stock comprised the sole assets of an acquired company, or where circumstances otherwise indicated that the purpose of the transaction was to acquire the shares in another company's portfolio. *Id.* at 411. Here, as the District Court emphasized, WG Biotech's only assets were shares of Y-mAbs stock. [SPA-31.] Moreover, Gad did not acquire WG Biotech, or shares of WG Biotech, i.e., a company that itself held Y-mAbs shares, as in the transaction in *At Home*. The Exchange in this case provided for Gad Enterprises to purchase shares of Y-mAbs stock held in WG Biotech's portfolio. Gad's purchase of the Y-mAbs shares from WG Biotech was the express purpose of the Exchange in this case, the Y-mAbs shares were the only assets Gad purchased, and the assets for which he paid all of the consideration (in the form of WG Biotech shares surrendered by Gad Enterprises).

23

The Court's holding in *At Home* is expressly inapplicable to this case. There is no basis for the District Court's interpretation of *At Home* as permitting courts to generally disregard the requirements of the narrow "unorthodox transaction" exclusion, or as permitting the District Court to exclude the Exchange from §16(b) based on entirely different considerations—none of which effectively mitigate the opportunity for speculative abuse targeted by the "bright line" rule against insider short swing trading.

Unlike *At Home*, and contrary to the District Court's characterization, this is not a case of first impression or even unusual facts. [SPA-22.] The Exchange does not present a scenario unfamiliar to courts applying §16(b). Gad sold stock he owned in one company (WG Biotech), and in exchange received shares of another company of which he was an insider (Y-mAbs).[3]

This is a typical scenario presented in cases involving stock-for-stock mergers—as in the case before the Court in *Kern County* for which the unorthodox

---

[3]     The District Court incorrectly describes the Exchange as a transaction whereby "two parties exchanged one type of securities for another without regard to the dollar value of either, with the purpose and design of extinguishing each party's interest in the other party's entity." [SPA-21.] Gad's ownership of WG Biotech was extinguished by the Exchange, but WG Biotech's ownership of Y-mAbs stock was not "extinguished"—WG Biotech continued to own shares of Y-mAbs following the Exchange. There is also no indication that the parties had no "regard to the dollar value" of the shares exchanged.

transaction exclusion was originally developed, and which this Court and numerous courts have since held are subject to §16(b) unless the unorthodox transaction exclusion or an exemption provided by SEC Rules applies. *Kern Cty.,* 411 U.S. at 596; *see Tannenbaum*, 2023 WL 4631963, at *5 (vacating order granting summary judgment for defendant and remanding for determination as to whether lack of access requirement of the unorthodox transaction requirement was adequately proven); *see also Champion Home Builders Co. v. Jeffress,* 385 F. Supp. 245, 248-49 (E.D. Mich. 1974) (determining §16(b) purchase price of shares of one company acquired in exchanged for shares of another company); *Mueller v. Korholz*, 449 F. 2d 82, 87 (7th Cir. 1971) (considering §16(b) claim based on merger transaction in which "As consideration for the Susquehanna shares acquired, Korholz parted with a block of Gypsum stock"); *Dreiling v. Amer. Exp. Co.*, 458 F. 3d 942, 945 (9th Cir. 2006) (evaluating whether exemption provided by SEC Rule 16b-3 applied to the acquisition of shares of by an alleged director "by deputization" of one company in exchange for shares of another company pursuant to a merger); *see generally* SEC Rule 16b-7, 17 C.F.R. §240.16b-7 (§16(b) exemption applicable to certain "*Mergers, Reclassifications, and Consolidations*" between corporate affiliates that involve the exchange of the securities of one company for the securities of another company).

25

The additional cases cited by the District Court to support the expansion of *At Home* are cases construing and applying the SEC's Rules regarding "*Derivative Securities*" to the expiration of outstanding options, or the closing of outstanding forward positions at a pre-determined time and price. *See Roth v. Goldman Sachs Grp., Inc.,* 740 F.3d 865, 869 (2d Cir. 2014) (construing SEC Rule 16b-6(d), regarding the expiration of put options); *Allaire Corp. v. Okumus,* 433 F. 3d 248, 252 (2d Cir. 2006) (same); *see also Chechele v. Sperling,* 758 F.3d 463, 467 (2d Cir. 2014) (evaluating whether the settlement of an outstanding pre-paid variable forward contract or PVFC on pre-set terms was treated as an additional §16(b) transaction under Rule 16b-6); *Donoghue v. Murdock,* No. 13 Civ. 1224 (PAE), 2013 WL 4007565, at *8 (S.D.N.Y. Aug. 6, 2013) (same). [SPA-25.]

There is no claim that the SEC Rule governing "Derivative Securities" applies to the Exchange. In contrast to all of the above cases, as the District Court acknowledged, Gad did not have the right or obligation under the WG Biotech Shareholders Agreement to acquire any Y-mAbs shares at a pre-determined time or price.

### B. **The Exchange Presented the Risk of Speculative Abuse**

District Court correctly notes that the exchange rate of 50.1 Y-mAbs shares for each WG Biotech share was determined by JWW, as he controlled WG Biotech's portfolio and the number of outstanding WG Biotech shares. But that does

26

not eliminate the risk of abuse targeted by §16(b). In every transaction there is a counterparty, and shares traded usually have a known market value.

The "involuntariness" prong of the unorthodox transaction exclusion is thus construed to require that the insider lack of control over *both the timing and the terms* of a transaction. Even if Gad knew that each of his WG Biotech shares had a value equivalent to 50.1 Y-mAbs shares, he was under no obligation to part with his WG Biotech shares, or to accept their equivalent value in Y-mAbs shares at any time. Gad determined when it was advantageous to take control of the power to sell the shares and to seize the opportunity profit from any increase in their market value. *Cf. Sperling,* 758 F.3d at 470 (noting that in cases involving "hybrid" derivatives, "one side controls the timing, and thus the price" of the exercise transaction).

A simple hypothetical further illustrates the manipulative risk presented by Gad's control of the timing of the Exchange. If Gad's undisputed access to inside information led him to believe that the market price of Y-mAbs shares was inflated, he might determine to sell the stock, which he did beginning in October 2020 [A-612-613]. And when there was a dip in market price, why not replenish and enhance his inventory of Y-mAbs shares by engaging his boyhood friend JWW to allow him to buy additional Y-mAbs shares owned by WG Biotech (by swapping his WG Biotech shares), only to promptly resell the Y-mAbs shares on the market at higher prices, which he also did?

27

This is only a possible hypothetical—but allegations of actual bad faith are not required for §16(b) to apply. The statute imposes strict liability if there is even the possibility of speculative abuse without the need to allege specific misconduct by insiders who engage in proscribed short swing trading. *Foremost-McKesson*, 423 U.S. at 251; *Kern Cty.,* 411 U.S. at 595; *Magma Power,* 136 F. 3d at 320.

The District Court also found persuasive that Gad had consistently reported his ownership of WG Biotech shares. The SEC has advised that insiders must report shares claimed to be within their "beneficial ownership" for purposes of the Rule 16a-13 exemption. But while reporting is a pre-requisite to the Rule 16a-13 exemption, it is not sufficient; an insider cannot prematurely claim the exemption simply by voluntarily reporting shares. Reporting another shareholder's transactions does not provide an insider with *carte blanche* to acquire those shares at any time and promptly sell the shares to the market at higher prices, reaping the profits without accountability under §16(b).

The opportunities for speculative abuse opened up by the District Court's opinion illustrate why the District Court's analysis is no substitute for the strict requirements of the unorthodox transaction doctrine, which are germane to the statute.

28

The requirement of involuntariness correlates to the statutory purpose of imposing a bright line rule capable of easy administration that could just as easily be avoided by avoiding trading. Trading that is involuntary cannot be avoided, and proscribing such trading does not serve the statutory remedial goals.

But involuntariness alone is insufficient to override the statutory presumption of abuse by insiders who engage in short swing trading. Where there is the possibility of insider access, there is the possibility of abuse—even if with respect to transactions that are involuntary. *See Tannenbaum*, 2023 WL 4631963, at *5 (although involuntariness requirement was satisfied with respect to "unorthodox" transaction, case remanded to the district court to further evaluate lack of access). An insider with access to non-public information can and should avoid short swing trading within six-months of any transaction not exempted by SEC "rules and regulations," full stop. 15 U.S.C. §78p(b).

29

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully submits that the District Court's dismissal of the action should be reversed.


Dated: December 9, 2024
     New York, NY

Respectfully submitted,

*/s/ David Lopez*

David Lopez
LAW OFFICES OF DAVID LOPEZ
PO Box 323 | 171 Edge of Woods Rd.
Southampton NY 11968
(631) 287-5520
DavidLopezEsq@aol.com

*/s/ Miriam Tauber*

Miriam Tauber
MIRIAM TAUBER LAW PLLC
885 Park Ave. 2A
New York NY 10075
(323) 790-4881
MiriamTauberLaw@gmail.com

*Attorneys for Plaintiff/Appellant*

### <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing Brief contains a total of 6,655 words and is formatted in Times New Roman 14 pt. font using Microsoft Word.


*/s/ Miriam Tauber*

_____

Miriam Tauber, *Attorney for Plaintiff/Appellant*

SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Katherine Polk
Failla, filed August 5, 2024.................................... SPA-1

Judgment, filed August 5, 2024 ............................... SPA-45

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DENNIS J. DONOGHUE,

                    Plaintiff,

          -v.-

Y-MABS THERAPEUTICS, INC.,

                    Nominal
                    Defendant,

          -and-

THOMAS GAD,

                    Defendant.

---

21 Civ. 7182 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

On March 3, 2021, Defendant Thomas Gad ("Defendant"), through his business entity GAD Enterprises, LLC ("GAD Enterprises"), entered into an exchange agreement with nonparty WG Biotech ApS ("WG Biotech"). Pursuant to that agreement, on March 10, 2021, Defendant conveyed 20,565 shares of WG Biotech back to WG Biotech, and WG Biotech conveyed 1,029,927 shares of the common stock of Nominal Defendant Y-mAbs Therapeutics, Inc. ("Y-mAbs") to Defendant. At the time of this exchange, the fair market value of Y-mAbs stock was $35.30 per share.

Plaintiff Dennis J. Donoghue ("Plaintiff") asserts that, in the six-month periods prior to and following March 10, 2021, Defendant sold a total of 212,000 shares of Y-mAbs common stock on the public market at prices higher than $35.30 per share. According to Plaintiff, through these sales, Defendant realized over $2,543,000 in so-called "short-swing" profits. Plaintiff brought

SPA-2

the instant action pursuant to Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b), otherwise known as the "short-swing profit rule," which requires insiders to forfeit any trading profit earned from buying and selling a company's stock within a six-month period.  Plaintiff seeks disgorgement of Defendant's alleged short-swing profits for the benefit of Y-mAbs.

Earlier in this case, Defendant moved to dismiss the Complaint and the Court denied the motion, concluding that certain factual information proffered by Defendant was not then properly before the Court.  That information is now before the Court, in the context of the parties' cross-motions for summary judgment.  For the reasons that follow, the Court grants Defendant's motion for summary judgment in full and denies Plaintiff's cross-motion for the same.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff Dennis J. Donoghue is a shareholder of Y-mAbs.  (Pl. 56.1 ¶ 1). Deborah Donoghue ("Original Plaintiff"), his late wife, was formerly the named

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with their respective motions for summary judgment.  The Court primarily sources facts from Defendant's Statement of Material Facts Pursuant to Local Rule 56.1 (each a "Rule 56.1 Statement") (Dkt. #104 ("Def. 56.1")), submitted in connection with his motion for summary judgment, as well as Plaintiff's Rule 56.1 Statement (Dkt. #109 ("Pl. 56.1")), submitted in connection with his motion for summary judgment; the Declaration of Amanda B. Asaro (Dkt. #105 ("Asaro Decl.")), and the exhibits attached thereto ("Asaro Decl., Ex. []"); the Declaration of Thomas Gad (Dkt. #106 ("Gad Decl.")), and the exhibits attached thereto ("Gad Decl., Ex. []"); and the Affirmation of Miriam Tauber (Dkt. #108 ("Tauber Aff.")), and the exhibits attached thereto ("Tauber Aff., Ex. []").

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is

2

SPA-3

plaintiff in this action.  (*See* Dkt. #43).  Following Deborah Donoghue's death

during the pendency of this litigation, Plaintiff (the Administrator with

Limitations of her non-probate estate) was substituted in as named plaintiff.

(*See* Dkt. #57; *see also infra* Background Section B).

Defendant Thomas Gad is the founder of Nominal Defendant Y-mAbs, a

biopharmaceutical company focused on the development and

commercialization of antibody-based therapeutic products for cancer

treatments.  (Def. 56.1 ¶¶ 1, 4).  Defendant currently serves as the interim

CEO, Head of Business Development, and President of Y-mAbs.  (*Id.* ¶ 2).

Defendant is also a member of the Y-mAbs Board of Directors.  (*Id.* ¶ 3).

### 2.    The Shareholders' Agreement

The series of transactions at issue in this case springs from a nexus of

natural persons and their associated legal entities that came into being in

---

supported by evidence and controverted only by a conclusory statement by the
opposing party, the Court finds that fact to be true.  *See* Local Civil Rule 56.1(c) ("Each
numbered paragraph in the statement of material facts set forth in the statement
required to be served by the moving party will be deemed to be admitted for purposes of
the motion unless specifically controverted by a correspondingly numbered paragraph
in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each
statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each
statement controverting any statement of material fact, must be followed by citation to
evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").
Where one party agrees to a fact set forth in the other party's Rule 56.1 Statement in its
entirety, the Court cites only the other party's Rule 56.1 Statement.

For ease of reference, the Court refers to Defendant's memorandum of law in support of
his motion for summary judgment as "Def. Br." (Dkt. #103); to Plaintiff's memorandum
of law in support of his motion for summary judgment as "Pl. Br." (Dkt. #110); to
Defendant's memorandum of law in opposition to Plaintiff's motion as "Def. Opp." (Dkt.
#113); to Plaintiff's memorandum of law in opposition to Defendant's motion as "Pl.
Opp." (Dkt. #116); to Defendant's reply memorandum of law in support of his motion as
"Def. Reply" (Dkt. #122); to Plaintiff's reply memorandum of law in support of his
motion as "Pl. Reply" (Dkt. #121); to Defendant's counter-statement to Plaintiff's Rule
56.1 Statement as "Def. Counter-56.1" (Dkt. #114); and to Plaintiff's counter-statement
to Defendant's Rule 56.1 Statement as "Pl. Counter-56.1" (Dkt. #115).

3

SPA-4

2015.  (Def. 56.1 ¶ 6).  That year, Johann Wedell-Wedellsborg ("JWW"), a childhood friend of Defendant's and a board member of Y-mAbs, established WG Biotech, an investment vehicle, for the purpose of investing in Y-mAbs.  (Pl. 56.1 ¶ 4; Def. Counter-56.1 ¶ 4; Def. 56.1 ¶ 7).  JWW served as the majority owner and manager of WG Biotech.  (Def. 56.1 ¶ 11).  Since its formation in 2015, WG Biotech's only assets have consisted of shares of Y-mAbs common stock.  (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 5).  Another JWW entity, Weco A/S ("Weco"), served as the holding company for (and thus as a shareholder of) WG Biotech. (Def. 56.1 ¶¶ 12, 59).[2]

Later that same year, Defendant invested in WG Biotech through GAD Enterprises, an entity that was solely owned and controlled by Defendant and his wife.  (Def. 56.1 ¶¶ 5-6).  Thereafter, GAD Enterprises owned Y-mAbs common stock both directly as well as indirectly through its ownership of WG Biotech.  (*Id.* ¶ 15).  Defendant thus held Y-mAbs common stock indirectly through both GAD Enterprises and WG Biotech.  (*Id.*).[3]

GAD Enterprises' investment in WG Biotech was memorialized in August 2015 through the WG Biotech Owner Agreement (the "Shareholders'

---

[2]   "Weco A/S" appears to be used interchangeably with "Weco Group A/S," "Weco," and "Weco Group" in the parties' submissions, including Rule 56.1 statements, depositions, and other underlying documents.  (*See, e.g.*, Asaro Decl., Ex. 3 (JWW Deposition Transcript) at 46:24-47:9, 52:15-53:3; Asaro Decl., Ex. 4 (Myhrmann Deposition Transcript) at 5:20-7:15; Gad Decl., Ex. 4 (Gad's Objections and Responses to Plaintiff's Requests for Admissions) at 6-7; Def. 56.1 ¶ 56; Pl. Counter-56.1 ¶ 56).  The Court will refer to this entity as "Weco" throughout this Opinion.

[3]   Plaintiff objects to describing GAD Enterprises as owning Y-mAbs stock "indirectly through ownership of WG Biotech."  (Pl. Counter-56.1 ¶ 15; *see also* Pl. Br. 19 (arguing that an example of "indirect" ownership would be "a transfer of shares from Gad [] to Gad [Enterprises]")).

4

SPA-5

Agreement"). (Def. 56.1 ¶ 10; *see generally* Gad Decl., Ex. 1 ("SA")). The Shareholders' Agreement was executed by Defendant and two of his entities — non-parties GAD Enterprises and GAD Management, LLC — on the one side, and JWW and his affiliate Weco Biotech ApS ("Weco Biotech") on the other. (Def. 56.1 ¶ 10; *see generally* SA). The purpose of the Shareholders' Agreement was "to ensure and regulate the parties['] collaboration" regarding WG Biotech's investment in Y-mAbs. (SA ¶ 1.1). At the time of the execution of the Shareholders' Agreement, the ownership of WG Biotech was split between GAD Enterprises, Defendant's entity, with a 36.1% ownership interest, and Weco Biotech, JWW's entity, with a 63.9% ownership interest. (Def. 56.1 ¶ 13; Pl. Counter-56.1 ¶ 13).

A number of provisions of the Shareholders' Agreement are relevant to the instant dispute. Specifically, under the Shareholders' Agreement:

- While GAD Enterprises (and thus Defendant) had certain rights, WG Biotech was ultimately controlled by JWW, who in turn controlled "the disposition and voting of the Y-mAbs shares held by WG Biotech for the benefit of GAD Enterprises." (Def. 56.1 ¶ 36; Pl. Counter-56.1 ¶ 36). At no time did Gad control WG Biotech, either directly or through his companies, GAD Enterprises or GAD Management, LLC. (*Id.* ¶ 37).

- GAD Enterprises' holdings of WG Biotech could not be sold or pledged elsewhere without GAD Enterprises' consent. (Def. 56.1 ¶ 33; SA ¶¶ 8-10 (stating that each party was entitled "to transfer its shares in entirety or in parts," and that the other party had the right of first refusal)).

- GAD Enterprises agreed to pledge certain shares of WG Biotech to Weco Biotech, JWW's entity, in exchange for a loan (the "WB Loan"). (Def. 56.1 ¶ 38). GAD

5

SPA-6

Enterprises was allowed to release this pledge by repaying the WB Loan to Weco Biotech.  (*Id.* ¶ 39).

▪ GAD Enterprises could demand that WG Biotech distribute a total of 33.3% of the prior year's profits — which would have come from dividends by Y-mAbs — to GAD Enterprises.  (Def. 56.1 ¶ 25; Pl. Counter-56.1 ¶ 25; SA ¶ 16.1 ("Any party may demand that [WG Biotech], within the relevant legal provisions, distribute a total of 33.3% of previous year's profits as dividends.")).  Though GAD Enterprises was entitled to this portion of WG Biotech's profits, WG Biotech's shares of Y-mAbs did not earn dividends, which would have been paid to GAD Enterprises.  (Def. 56.1 ¶ 26; Pl. Counter-56.1 ¶ 26).

### 3. Investments in Y-mAbs

Beginning in 2016, "other investors" began investing in WG Biotech. (Def. 56.1 ¶ 40).[4]  Importantly, the shares of Y-mAbs common stock held by WG Biotech were specifically attributed to WG Biotech's investors (including GAD Enterprises) based on each investor's *pro rata* ownership of WG Biotech. (*Id.* ¶ 41; Pl. Counter-56.1 ¶ 41).  To that end, WG Biotech's records identify each WG Biotech investor, the number of WG Biotech shares owned by that investor, and the number of Y-mAbs shares owned by that investor based on its *pro rata* ownership in WG Biotech.  (Def. 56.1 ¶ 42).

In September 2018, Y-mAbs became a publicly listed and traded company on the Nasdaq Global Select Market.  (Def. 56.1 ¶ 43).  After Y-mAbs went public, Defendant regularly filed reports with the U.S. Securities and Exchange Commission (the "SEC") disclosing his beneficial ownership of Y-

---

[4]    Plaintiff clarifies that these "other investors" invested in WG Biotech by purchasing WG Biotech shares from GAD Enterprises.  (Pl. Counter-56.1 ¶ 40).

SPA-7

mAbs common stock through both GAD Enterprises and WG Biotech.  (*Id.* ¶ 44; *see, e.g.*, Gad Decl., Ex. 2 at 2 (SEC Form 3, Initial Statement of Beneficial Ownership of Securities, dated September 20, 2018); Gad Decl., Ex. 3C at 2 (SEC Form 4, Statement of Changes in Beneficial Ownership, dated March 12, 2021)).

   For example, on April 11, 2019, Defendant filed a Form 4 – Statement of Changes in Beneficial Ownership ("Form 4") with the SEC, which form reported that GAD Enterprises indirectly beneficially owned 1,030,557 shares of Y-mAbs common stock through his then-20.57% ownership of WG Biotech, which in turn owned 5,010,000 shares of Y-mAbs common stock.  (Def. 56.1 ¶¶ 48-49; Pl. Counter-56.1 ¶ 49; *see* Gad Decl., Ex. 3A at 3).  The Form 4 also reflected GAD Enterprises' direct ownership of 940,000 shares of Y-mAbs common stock.  (*See id.*).  Later, on December 31, 2019, Defendant filed another Form 4, which reported that GAD Enterprises indirectly beneficially owned 1,030,356 shares of Y-mAbs common stock through his then-18.71% ownership of WG Biotech, which in turn owned 5,508,392 shares of Y-mAbs common stock. (Def. 56.1 ¶¶ 50-51; Pl. Counter-56.1 ¶ 51; *see* Gad Decl., Ex. 3A at 22).  The Form 4 also reflected GAD Enterprises' direct ownership of 860,000 shares of Y-mAbs common stock.  (*See id.*).  Further, the Form 4 indicated that WG Biotech's holdings of Y-mAbs common stock had increased due to a transfer of 498,392 shares of Y-mAbs common stock from WG Biotech's holding company Weco, in exchange for 9,948 ordinary shares of WG Biotech.  (Def. 56.1 ¶ 52; *see* Gad Decl., Ex. 3A at 22 n.2).

SPA-8

### 4. The July 2019 Transaction

In 2019, JWW decided to eliminate all minority investors in WG Biotech, except for his affiliated companies (Def. 56.1 ¶ 58; Pl. Counter-56.1 ¶ 58), with the assistance of Oluf Myhrmann, Weco's group treasurer (Def. 56.1 ¶ 12). Importantly, at that time, Weco was both an investor in WG Biotech and a direct owner of Y-mAbs shares. (*Id.* ¶ 59). To effectuate their plan, the two men caused Weco to enter into an agreement with all of WG Biotech's minority investors *other than Weco Biotech and GAD Enterprises*, whereby Weco traded its directly-held Y-mAbs shares for the minority investors' holdings in WG Biotech (the "July 2019 Transaction"). (*Id.* ¶¶ 58-59).[5] Each of the minority investors' WG Biotech shares was exchanged for approximately 50.1 Y-mAbs shares. (*Id.* ¶ 60; Pl. Counter-56.1 ¶ 60). As a result of the July 2019 Transaction, WG Biotech's former minority investors directly owned Y-mAbs shares and no longer held shares of WG Biotech. (Def. 56.1 ¶ 61; Pl. Counter-56.1 ¶ 60). Of note, Defendant had neither involvement in nor authority over the terms or timing of this transaction. (*See* Asaro Decl., Ex. 4 (Myhrmann Deposition Transcript) at 31:19-38:25).

After the July 2019 Transaction, WG Biotech's remaining shareholders were GAD Enterprises, Weco, and Weco Biotech. (Def. 56.1 ¶ 64; Pl. Counter-

---

[5]   Plaintiff asserts that Mhyrmann testified that in 2019, JWW endeavored to eliminate all minority investors in WG Biotech except for his affiliated companies *and* GAD Enterprises. (Pl. Counter-56.1 ¶¶ 58, 63). Mhyrmann's deposition transcript belies this assertion and states that JWW intended to eliminate all minority investors, including GAD Enterprises, but that the exchanges occurred in sequence rather than all at one time. (Asaro Decl., Ex. 4 at 31:19-38:25).

SPA-9

56.1 ¶ 64).  In other words, WG Biotech's shares were under the control of GAD Enterprises or JWW's wholly owned and controlled subsidiaries.  (*Id.*).

### 5.    The March 2021 Transaction and the Exchange Agreement

On March 2, 2021, Gad filed an updated Form 4 in which GAD Enterprises reported owning 1,030,356 Y-mAbs shares indirectly through WG Biotech as well as 596,000 Y-mAbs shares directly.  (Def. 56.1 ¶¶ 67, 77; Pl. Counter-56.1 ¶ 67; Gad Decl., Ex. 3B at 34).  WG Biotech held 5,508,392 shares of Y-mAbs common stock at this time.  (Def. 56.1 ¶ 68).

The next day, March 3, 2021, GAD Enterprises and WG Biotech entered into an agreement (the "Exchange Agreement") that would have the effect of eliminating GAD Enterprises' ownership interest in WG Biotech.  (Def. 56.1 ¶ 71).  Pursuant to the Exchange Agreement, GAD Enterprises was to exchange 20,565 shares of WG Biotech for 1,029,927 shares of Y-mAbs.  (*Id.* ¶ 73).  GAD Enterprises was to receive 1,029,927 shares of Y-mAbs common stock — rather than the 1,030,356 shares of Y-mAbs common stock that Defendant had reported indirectly owning through WG Biotech on his March 2, 2021 Form 4 — because GAD Enterprises still owed money to Weco Biotech on the WB Loan, which GAD Enterprises had taken out pursuant to the Shareholders' Agreement.  (*Id.* ¶ 77).

The Exchange Agreement was effectuated on March 10, 2021 (the "March 2021 Transaction").  (Def. 56.1 ¶ 80).  On March 10, 2021, the closing sale price of Y-mAbs common stock was $35.30 per share.  (Pl. 56.1 ¶ 24; Def. Counter-56.1 ¶ 24).  Once the transaction was complete, GAD Enterprises no

SPA-10

longer held shares of WG Biotech, thereby extinguishing GAD Enterprises' "right, title, and interest in WG Biotech." (Def. 56.1 ¶ 78). Further, WG Biotech's only investors were entities under JWW's control. (*Id.* ¶¶ 65-66).

The July 2019 Transaction and the March 2021 Transaction were executed "on the same material terms" as one another. (Def. 56.1 ¶ 75).[6] Each of GAD Enterprises' shares of WG Biotech was exchanged for approximately 50.1 shares of Y-mAbs common stock, the same consideration received by the minority investors who were parties to the July 2019 Transaction. (*Id.* ¶¶ 74, 81). On March 12, 2021, Defendant filed a Form 4 disclosing that 1,029,927 shares of Y-mAbs common stock had been transferred to GAD Enterprises by WG Biotech in exchange for 20,565 shares of WG Biotech. (*Id.* ¶ 82; *see* Gad Decl., Ex. 3C at 3 n.1).

### 6. Defendant's Sales of Y-mAbs Common Stock Before and After the March 2021 Transaction

Relevant to the instant dispute, in the six months before the March 2021 Transaction, *i.e.*, between October 15, 2020, and March 2, 2021, Defendant engaged in 19 transactions in which he sold Y-mAbs stock directly owned by GAD Enterprises. (Pl. 56.1 ¶¶ 28-29; *see also* Tauber Aff., Ex. 16-19). Importantly, these sales were made at prices greater than $35.30 per share. (Pl. 56.1 ¶¶ 28-29).

---

[6]   Plaintiff does not appear to dispute that the terms of the two transactions were effectively the same, but maintains that Defendant voluntarily agreed to the Exchange Agreement and had the capacity to negotiate its terms. (Pl. Counter-56.1 ¶¶ 72, 74-75).

10

SPA-11

Following the March 2021 Transaction, GAD Enterprises had the sole right to sell the shares of Y-mAbs common stock that it had obtained from that exchange, having been released from the strictures of the Shareholders' Agreement. (Def. 56.1 ¶ 84; SA ¶ 18.1 (stipulating that the Shareholders' Agreement was "irrevocable" until the parties agreed to terminate it or "until a party becomes the owner of all [of] the shares [of WG Biotech]")). In the six months thereafter, Defendant engaged in four transactions in which he sold Y-mAbs stock at prices greater than $35.30 per share. (Pl. 56.1 ¶¶ 28-29).

Defendant's sales of Y-mAbs stock in the six months before and after the March 2021 Transaction are as follows:

| Sale Date | Shares | Price/Share | Sale Proceeds |
|-----------|--------|-------------|---------------|
| 10/15/2020 | 4,000 | $39.15 | $156,604 |
| 11/02/2020 | 4,000 | $43.69 | $174,769 |
| 11/16/2020 | 4,000 | $46.17 | $184,672 |
| 12/01/2020 | 4,000 | $51.42 | $205,685 |
| 12/10/2020 | 50,000 | $50.75 | $2,537,620 |
| 12/11/2020 | 50,000 | $51.17 | $2,558,640 |
| 12/14/2020 | 4,000 | $52.89 | $211,546 |
| 12/16/2020 | 7,000 | $53.01 | $371,065 |
| 12/28/2020 | 7,000 | $51.98 | $363,833 |
| 01/05/2021 | 7,000 | $49.36 | $345,509 |
| 01/05/2021 | 4,000 | $49.31 | $197,248 |
| 01/19/2021 | 7,000 | $46.51 | $325,563 |
| 01/19/2021 | 4,000 | $46.56 | $186,230 |
| 02/01/2021 | 7,000 | $41.99 | $293,897 |
| 02/01/2021 | 4,000 | $41.97 | $167,888 |
| 02/16/2021 | 7,000 | $47.08 | $329,556 |
| 02/16/2021 | 4,000 | $47.09 | $188,367 |
| 03/01/2021 | 9,000 | $35.51 | $319,611 |
| 03/01/2021 | 6,000 | $35.50 | $213,029 |
| 03/15/2021 | 7,000 | $36.79 | $257,554 |
| 03/15/2021 | 4,000 | $36.78 | $147,120 |
| 05/28/2021 | 4,000 | $36.95 | $147,813 |
| 06/14/2021 | 4,000 | $35.80 | $143,217 |

SPA-12

| Total Shares Sold | 212,000 | Total Sale Proceeds | $10,027,034 |
|---|---|---|---|

(Pl. 56.1 ¶ 28; Def. Counter-56.1 ¶ 28 (not disputing the accuracy of the transaction data)). Plaintiff seeks to recover the purported short-swing profits realized by Defendant through the above transactions. (Compl. ¶ 21).

**B.    Procedural Background**

Original Plaintiff Deborah Donoghue initiated this case by filing a complaint (the "Complaint") on August 25, 2021. (Dkt. #1). On November 29, 2021, Nominal Defendant Y-mAbs filed its answer to the Complaint. (Dkt. #28). Following a pre-motion conference on December 1, 2021 (*see* Minute Entry for December 1, 2021), Defendant filed a motion to dismiss on December 17, 2021 (Dkt. #29). Original Plaintiff filed her opposition brief on December 31, 2021. (Dkt. #33). Defendant filed a reply brief in further support of his motion to dismiss on January 12, 2022. (Dkt. #35).

On August 8, 2022, this Court denied Defendant's motion to dismiss. (Dkt. #37). Of potential significance to the instant motion, the Court determined that the record in place at the time did not allow the Court to conclude as a matter of law that Defendant's acquisition of Y-mAbs common stock on March 10, 2021, was exempt from Section 16(b) under Rule 16a-13. (*Id.* at 6). On August 25, 2022, the Court issued a case management plan and scheduling order, permitting the parties to proceed to discovery. (Dkt. #41).

On September 9, 2022, Defendant Gad filed an answer to the Complaint. (Dkt. #42 ("Gad Answer")). Shortly thereafter, on September 21, 2022, counsel for Original Plaintiff informed the Court that Original Plaintiff had passed away.

12

SPA-13

(Dkt. #43).  Following the notice of Original Plaintiff's death, the parties requested an extension of time on all deadlines set forth in the August 25, 2022 scheduling order.  (Dkt. #45).  The Court granted that request on September 26, 2022 (Dkt. #46) and issued an amended scheduling order the following day (Dkt. #47).

On October 6, 2022, counsel for Plaintiff filed a letter motion to add another shareholder of Y-mAbs — not Dennis Donoghue — to the lawsuit as an additional plaintiff-intervenor.  (Dkt. #50).  Defendant opposed this motion. (Dkt. #51).  The Court denied the letter motion without prejudice as to its renewal as a formal motion.  (Dkt. #52).

Subsequently, Plaintiff's counsel moved to substitute now-Plaintiff Dennis Donoghue as party to this litigation and to terminate Original Plaintiff on November 7, 2022.  (Dkt. #53-55).  Neither Nominal Defendant nor Defendant objected to the substitution motion.  (Dkt. #56).  The Court granted the motion to substitute parties on November 17, 2022.  (Dkt. #57).

Following the substitution of parties, on December 30, 2022, Plaintiff requested permission to seek letters rogatory to obtain the assistance of law enforcement in Denmark in procuring discovery from JWW in the form of documents and oral deposition testimony.  (Dkt. #58).  Later that same day, Defendant sought additional time to complete discovery (Dkt. #59), given the delays incurred by the applications for intervention (Dkt. #50-52); the substitution of parties (Dkt. #53-57); and the challenges in obtaining JWW's deposition testimony (Dkt. #58).  The Court granted Plaintiff's request for leave

13

SPA-14

to move for letters rogatory as well as Defendant's request for an additional sixty days to complete discovery. (Dkt. #60; Dkt. #61 (Second Amended Case Management Plan and Scheduling Order)).

On January 9, 2023, Plaintiff moved for letters rogatory to compel JWW's appearance for a deposition. (Dkt. #63). Neither Defendant nor Nominal Defendant objected to Plaintiff's motion. (Dkt. #64-65). The Court thus granted Plaintiff's motion for letters rogatory on January 17, 2023. (Dkt. #66).

On April 27, 2023, the parties jointly filed a pre-conference letter to update the Court on the progress of discovery and to request a mediation conference with a Magistrate Judge prior to any motions for summary judgment. (Dkt. #68). The Court accordingly referred the case to Magistrate Judge Sarah L. Cave for a settlement conference on May 3, 2023. (Dkt. #70). However, the parties were unable to resolve the matter through settlement (*see* Dkt. #77), and on May 30, 2023, the Court set forth a briefing schedule on the parties' anticipated cross-motions for summary judgment (*see* Dkt. #77-79).

Following a change of counsel for Defendant (*see* Dkt. #90, 92, 95, 96, 97), and subsequent amendments to the original briefing schedule (*see* Dkt. #88, 95, 101), the parties ultimately filed their cross-motions for summary judgment in early 2024. Specifically, Defendant filed his motion for summary judgment and supporting documents on January 31, 2024. (Dkt. #102-106). Plaintiff filed his motion for summary judgment and supporting documents on

SPA-15

February 1, 2024. (Dkt. #107-110).[7] Pursuant to this District's local rules, each party submitted a statement of material facts in conjunction with their motion for summary judgment. *See* S.D.N.Y. Local Rule 56.1(a) (noting that each party moving for summary judgment under Fed. R. Civ. P. 56 must submit "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried"). (*See also* Dkt. #104 (Defendant's Rule 56.1 Statement, filed January 31, 2024); Dkt. #109 (Plaintiff's Rule 56.1 Statement, filed February 1, 2024)). Defendant filed his memorandum of law in opposition to Plaintiff's motion for summary judgment as well as his counterstatement to Plaintiff's Rule 56.1 Statement on February 29, 2024. (Dkt. #113-114). Plaintiff filed his memorandum of law in opposition to Defendant's motion for summary judgment and his counterstatement to Defendant's Rule 56.1 Statement on March 1, 2024. (Dkt. #115-116). Plaintiff and Defendant each filed reply briefs in further support of their respective motions for summary judgment on March 19, 2024. (Dkt. #121-122).

---

[7]    Though Plaintiff submitted his motion for summary judgment and related materials after the January 31, 2024 deadline, the Court granted Plaintiff's application to file these materials a few hours after the deadline due to technical challenges. (Dkt. #111-112).

SPA-16

## DISCUSSION

**A.  Applicable Law**

### 1.  Motions for Summary Judgment Under Rule 56

To succeed on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), a litigant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8]  Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  Further, in considering whether the movant has met its burden to "show that no genuine factual dispute exists," a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

The standard used to decide cross-motions for summary judgment, such as the motions pending before the Court, "is the same as that for individual summary judgment motions[;] a court must consider each motion independent

---

[8]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

of the other." *Worldwide Home Prods., Inc.* v. *Bed, Bath and Beyond, Inc.*, 74 F.

Supp. 3d 626, 634 (S.D.N.Y. 2015) (internal quotation marks omitted); *see*

*Auscape Intern.* v. *Nat'l Geographic Soc.*, 409 F. Supp. 2d 235, 238 (S.D.N.Y.

2004) ("A court faced with cross-motions for summary judgment need not

'grant judgment as a matter of law for one side or the other,' but 'must evaluate

each party's motion on its own merits, taking care in each instance to draw all

reasonable inferences against the party whose motion is under consideration.'"

(quoting *Heublein, Inc.* v. *United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)));

*accord Upstate Jobs Party* v. *Kosinski*, 106 F.4th 232, 244-45 (2d Cir. 2024).

### 2.    Section 16(b) of the Exchange Act

Section 16(b) of the Exchange Act "requires [certain corporate insiders] …

to disgorge all profits realized from any purchase and sale (or sale and

purchase) of the same security made within a six[-]month period," transactions

often referred to as "short-swing" trades. *Analytical Survs., Inc.* v. *Tonga*

*Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012). Specifically, the statute reads:

> For the purpose of preventing the unfair use of
> information which may have been obtained by [an
> insider] … any profit realized by him from any purchase
> and sale, or any sale and purchase, of any equity
> security of such issuer … within any period of less than
> six months … shall inure to and be recoverable by the
> issuer, irrespective of any intention on the part of such
> [insider][.]

15 U.S.C. § 78p(b). The purpose of Section 16(b) is "to prevent the unfair use

of information which may have been obtained by [a] beneficial owner, director,

or officer by reason of his relationship to the issuer." *Packer on Behalf of 1-*

17

SPA-18

*800-Flowers.Com, Inc.* v. *Raging Cap. Mgmt., LLC*, 105 F.4th 46, 52-53 (2d Cir. 2024) (internal quotation marks omitted).

For liability to attach to a short-swing trade under Section 16(b), a plaintiff must prove that "there was [i] a purchase and [ii] a sale of securities [iii] by an [insider] [iv] within a six-month period." *Chechele* v. *Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky* v. *Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)).[9] Importantly, the statute applies irrespective of the insider's motivation for making the trades. *See Analytical Survs.*, 684 F.3d at 43; *Rubenstein* v. *Int'l Value Advisers, LLC*, 959 F.3d 541, 543 (2d Cir. 2020) ("[Section 16(b)] imposes strict liability on certain insiders of an issuer, requiring them to disgorge to the issuer any profits they realize from short-swing trading in the issuer's securities."). Further, the statute extends "not only to routine cash purchases and sales, but also acquisitions and dispositions of equity securities in transactions such as conversions, options, stock warrants, and reclassifications." *Huppe* v. *WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012) (citing *Blau* v. *Lamb*, 363 F.2d 507, 516 (2d Cir. 1966)).

In contrast to most federal securities laws, Section 16(b) "does not confer enforcement authority on the [SEC]." *Donoghue* v. *Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 174 (2d Cir. 2012) (quoting *Gollust* v. *Mendell*, 501 U.S. 115, 122 (1991)). Rather, "[t]he statute allows the company whose stock was traded to recover profits made by the beneficial owner during that period." *Avalon*

---

[9]     Because many Section 16(b) lawsuits are brought by a small number of plaintiffs, including Original Plaintiff here, the Court uses the name of the defendant in the short form citation of certain cases to avoid confusion.

SPA-19

*Holdings Corp.* v. *Gentile*, No. 18 Civ. 7291 (DLC) (RWL), 2023 WL 6566810, at

*1 (S.D.N.Y. Oct. 6, 2023).  Specifically, Section 16(b) authorizes two categories

of private persons to sue for relief:

> [i] "the issuer" of the security traded in violation of
> § 16(b); *or* [ii] "the owner of any security of the issuer in
> the name and on behalf of the issuer," but only "if the
> issuer shall refuse to bring such suit within sixty days
> after the request or shall fail diligently to prosecute the
> same thereafter."

*Bulldog Invs.*, 696 F.3d at 174 (quoting 15 U.S.C. § 78p(b)) (emphasis in

original).

**B.    Analysis**

Both parties seek summary judgment on Plaintiff's claim for

disgorgement of Defendant's alleged short-swing profits, reasoning either that

the March 2021 Transaction is subject to Section 16(b) liability, as Plaintiff

contends (*see, e.g.*, Pl. Br. 1), or that it is not, as Defendant contends (*see, e.g.*,

Def. Br. 1).  As detailed above, for liability to attach under Section 16(b),

Plaintiff must prove that "there was [i] a purchase and [ii] a sale of securities

[iii] by an [insider] [iv] within a six-month period."  *Sperling*, 758 F.3d at 467.

Here, the parties' cross-motions turn on the adjudication of two disputes:

(i) whether the March 2021 Transaction constituted a "purchase" of Y-mAbs

shares under Section 16(b) (*see, e.g.*, Pl. Br. 8-9; Def. Br. 14-15), and

(ii) whether SEC Rule 16a-13, which exempts from Section 16(b) liability any

acquisition that effects "only a change in the form of beneficial ownership

without changing a person's pecuniary interest in the subject equity

19

SPA-20

securities," 17 C.F.R. § 240.16a-13, applies to the March 2021 Transaction (*see, e.g.*, Pl. Br. 18-19; Def. Br. 20).

For the reasons that follow, the Court finds *both* that the March 2021 Transaction was not a "purchase" under Section 16(b) and that the Rule 16a-13 exemption applies to the March 2021 Transaction, each an independent basis for concluding that Section 16(b) liability does not attach to Defendant's trades. Accordingly, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for the same.

### 1. The March 2021 Transaction Was Not a Purchase Under Section 16(b)

To begin, the parties disagree as to whether Defendant's acquisition of the 1,029,927 shares of Y-mAbs common stock from WG Biotech in exchange for his 20,565 shares of WG Biotech (*i.e.*, the March 2021 Transaction) constitutes a "purchase" of Y-mAbs shares under Section 16(b). (*See, e.g.*, Pl. Br. 8-9; Def. Br. 14-15). As set forth herein, the Court finds that the March 2021 Transaction did not constitute a "purchase" for Section 16(b) purposes, and therefore that Section 16(b) liability does not attach to Defendant as a consequence of that transaction.

The Exchange Act defines a "purchase" (for the purposes of Section 16(b) and otherwise) to "include any contract to buy, purchase, or otherwise acquire." *DiLorenzo* v. *Murphy*, 443 F.3d 224, 227 (2d Cir. 2006) (emphasis omitted) (quoting 15 U.S.C. § 78c(a)(13)). This definition is a "broad[]" one, and "may be applied not only to routine cash purchases and sales, but also to acquisitions and dispositions of equity securities in transactions such as

20

conversions, options, stock warrants, and reclassifications." *Huppe*, 670 F.3d at 218.

In some cases, it is clear that a transaction at issue is a "purchase" pursuant to Section 16(b). That is, certain types of transactions "plainly fall within the literal terms of [Section 16(b)]." *Steel Partners II, L.P.* v. *Bell Industries, Inc.*, 315 F.3d 120, 124 (2d Cir. 2002) ("*Steel Partners*"). In those cases, the defendants typically acquire or dispose of certain securities in exchange for fiat currency. *See, e.g.*, *Bulldog Invs.*, 696 F.3d at 173 (finding that purchase and sale of shares on open market indisputably constituted a "purchase" under Section 16(b)); *Huppe*, 670 F.3d at 216-18 (finding that acquisition of securities from an issuer — wherein "[defendants] ... bought 876,931 additional shares directly from [the nominal defendant-issuer] at $7.00 per share" — plainly constituted a "purchase" under Section 16(b)).

Unfortunately, this case is not one of them. That is, the March 2021 Transaction does not "plainly fall within the literal terms of the statute." *Steel Partners*, 315 F.3d at 124. Rather, the March 2021 Transaction — pursuant to which two parties exchanged one type of securities for another without regard to the dollar value of either, with the purpose and design of extinguishing each party's interest in the other party's entity — presents a "novel theory of insider purchasing." *At Home Corp.* v. *Cox Communications, Inc.*, 446 F.3d 403, 408 (2d Cir. 2006) ("*At Home*"). Indeed, it constitutes a case of first impression in this District.

21

SPA-22

The Second Circuit has cautioned that, where a transaction does not "plainly fall within the literal terms of the statute," *Steel Partners*, 315 F.3d at 124, "[t]he judicial tendency, especially in this [C]ircuit, has been to interpret Section 16(b) in ways that are most consistent with [its] legislative purpose," *DiLorenzo*, 443 F.3d at 227 (quoting *Steel Partners*, 315 F.3d at 124 (internal quotation marks omitted)). Generally, this analysis proceeds in one of two ways. *First*, for certain "borderline" or "unorthodox" transactions, *Huppe*, 670 F.3d at 218, the Supreme Court has instructed courts to

> inquire whether the transaction [at issue] may serve as a vehicle for the evil which Congress sought to prevent [in enacting Section 16(b)] — the realization of short-swing profits based upon access to inside information — thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits.

*Kern County Land Co.* v. *Occidental Petroleum Corp.*, 411 U.S. 582, 594-95 (1973). Courts have come to refer to this doctrine as the "unorthodox" or "borderline" transaction exception, or eponymously as the *Kern County* approach. *See, e.g.*, *Canoo Inc.* v. *DD Global Holdings Ltd.*, No. 22 Civ. 3747 (MKV), 2023 WL 6162296, at *8 (S.D.N.Y. Sept. 21, 2023) (citing *Huppe*, 670 F.3d at 218).

The borderline transaction exception only applies when two factual criteria are met: (i) the transaction was made involuntarily by an insider and (ii) that insider had no access to inside information. *See, e.g.*, *Analytical Survs.*, 684 F.3d at 46 (noting that "both an involuntary transaction and lack of access to inside information are prerequisites to the *Kern County* analysis"

22

(citing *Huppe*, 670 F.3d at 219)); *Donoghue* v. *Tannenbaum*, No. 22-1156, 2023 WL 4631963, at *2 (2d Cir. July 20, 2023) (summary order) ("We apply this unorthodox transaction exception only if [i] the transaction is an involuntary transaction by an insider, and [ii] that insider had no access to inside information." (alterations adopted) (internal quotation marks omitted)).  If both factual criteria are met, courts then proceed to analyze whether such transactions present "the potential for speculative abuse of [] inside information."  *Kern County*, 411 U.S. at 599.

    *Second*, in cases where the disputed transaction does not "plainly fall within the literal terms of the statute," *Steel Partners*, 315 F.3d at 124, but where *Kern County* does not apply, *see, e.g.*, *Analytical Survs.*, 684 F.3d at 46 (noting that "the *Kern County* borderline transaction approach does not control cases involving 'a garden-variety insider' who had [] access" to exploitable inside information), courts simply analyze whether the transaction at issue presents a risk of the type of speculative abuse Section 16(b) seeks to prevent, *see, e.g.*, *At Home*, 446 F.3d at 408-09.  As the Second Circuit has noted, "the growing complexities of financial transactions have generated numerous issues of statutory interpretation that admit of no clear resolution."  *Roth* v. *Goldman Sachs Grp., Inc.*, 740 F.3d 865, 869 (2d Cir. 2014).  Accordingly, in cases of first impression — *i.e.*, where courts are presented with novel securities transactions vis-à-vis Section 16(b) liability — this Circuit has applied the statutory purpose analysis without requiring the two factual prerequisites from *Kern County* to be met.

23

SPA-24

For instance, in *At Home Corp.* v. *Cox Communications, Inc.*, the Second Circuit considered whether "an insider's acquisition of stock in the issuer by acquisition of a third-party intermediary company gives rise to [S]ection 16(b) liability for short-swing profits." 446 F.3d at 409. Importantly, the Court found that the *Kern County* criteria were not met by the transactions at issue because they involved a "garden-variety insider." *Id.* at 408. Nevertheless, the Court concluded that the transactions were not "purchases" under Section 16(b) because they were "[g]ood faith change in control transactions" that did not present the risk of insider speculation. *Id.* at 409 (internal quotation marks omitted). Specifically, the Court found persuasive the SEC's recommendation (via *amicus* brief) that "a typical change-of control transaction does not present an intolerable risk of abuse[.]" *Id.*[10]

*At Home* stands for the proposition that, even where *Kern Country* does not apply, a novel transaction may still escape Section 16(b) liability if it involves no risk of insider speculation. *See At Home*, 446 F.3d at 409; *see also Sperling*, 758 F.3d at 470 (analyzing "risk of manipulation" presented by defendants' transactions where it was undisputed that defendants were "insiders")*; Gibbons* v. *Malone*, 703 F.3d 595, 601 (2d Cir. 2013) ("[W]e generally interpret ambiguous terms of [Section] 16(b) in a way that best serves the congressional purpose of curbing short-swing speculation by corporate

---

[10]   The Second Circuit stated that while it found the SEC's *amicus* brief in *At Home* persuasive, it did not need to decide whether the SEC's submission would "command deference." *At Home Corp.* v. *Cox Communications, Inc.*, 446 F.3d 403, 409 n.5 (2d Cir. 2006).

24

insiders." (internal quotation marks omitted)); *cf. Gwozdzinsky*, 156 F.3d at 310 (explaining that courts look to "the substance of … transactions" to assess the possibility of speculative abuse of insider information "and, where the possibility of speculative abuse [is] not shown," "refuse to impose liability even though there was arguably a matching purchase and sale by an insider within six months").

When determining whether a transaction presents a risk of insider speculation, courts in this Circuit have focused on whether defendants were able to manipulate the criteria or terms that governed the transaction at issue based on their access to inside information.  *See, e.g.*, *Allaire Corp.* v. *Okumus*, 433 F.3d 248, 252 (2d Cir. 2006) ("[S]ection 16(b) covers only the transaction in which the parties agree to the terms of sale, because that is the one in which the writer of the option can be deemed to be using his or her inside information to arrive at the option's terms on a favorable basis."); *Donoghue* v. *Murdock*, No. 13 Civ. 1224 (PAE), 2013 WL 4007565, at *8 (S.D.N.Y. Aug. 6, 2013) ("If a financial instrument lacks a fixed settlement price, but will settle on a determinate date at a price to be calculated by a predetermined formula … the die is cast … [t]he insider's only opportunity to abuse inside information occurs at acquisition, not at settlement."); *Chechele* v. *Sperling*, No. 11 Civ. 146 (PAC), 2012 WL 1038653, at *5 (S.D.N.Y. Mar. 29, 2012) (finding that treating the date of acquisition as the relevant sale date, rather than the date of settlement, furthered Section 16(b)'s purpose because "the number of shares to be sold on the settlement date depended upon formulas which were set two to three years

SPA-26

earlier" and "[defendants] had no opportunity to speculate on the basis of their inside information at the time of [settlement]"). Put another way, if, at the time of a transaction, a defendant lacks the ability to manipulate the previously established terms of that transaction to benefit from her possession of inside information, the transaction does not constitute a purchase under Section 16(b).

The analysis of a sister court in this District in *Donoghue* v. *Murdock* is illuminative of this point. 2013 WL 4007565.[11] In that case, the plaintiff, a security owner of Dole Food Company, Inc. ("Dole"), brought a complaint under Section 16(b) against defendant David Murdock ("Murdock") and, nominally, Dole. *Id.* at *1. The plaintiff alleged that Murdock, who was a fiduciary of Dole, realized short-swing profits when he purchased nearly five million shares of Dole within a six-month window of a Settlement Date of a Forward Purchase Agreement for Dole common stock. *Id.* Murdock and Dole moved to dismiss the plaintiff's amended complaint, and the court granted their motion. *Id.* In reaching that decision, the court considered dispositive the fact that Murdock was not able to influence the terms of the settlement transaction at any point close in time to the transaction. *Id.* at *8.

---

[11]  The Court notes that in *Donoghue* v. *Murdock*, the disputed transaction was a "sale," as opposed to a "purchase." 2013 WL 4007565, at *4. The Court does not believe that this fact renders *Murdock* inapposite — at least, its analysis of whether the transaction at issue presented a risk of insider speculation. Indeed, the *Murdock* Court analogized the transaction at issue in that case to the transaction at issue in *Chechele* v. *Sperling*, No. 11 Civ. 146 (PAC), 2012 WL 1038653 (S.D.N.Y. Mar. 29, 2012), which transaction was undoubtedly a "purchase."

SPA-27

In other words, the key question for the *Murdock* court was whether Murdock had the "ability to manipulate the settlement of the instrument to his advantage." *Murdock*, 2013 WL 4007565, at *8. The court reasoned that "[i]f a financial instrument lacks a fixed settlement price, but will settle on a determinate date at a price to be calculated by a predetermined formula, the insider has no ability to manipulate the settlement of the instrument to his advantage." *Id.* In other words, "[a]lthough the exact number of shares to be delivered, and hence the per share price, was not yet fixed at the date the [Forward Purchase Agreement] was entered into, the formula was [fixed] …. Murdock was powerless to change these terms." *Id.* at *9. The court thus rejected the plaintiff's claim that Murdock was able to take advantage of insider information at the time of the settlement transaction, finding instead that Murdock lacked an "*informational* advantage, which, as the statutory text makes clear, was the only type of insider advantage Congress intended [Section] 16(b) to strip away." *Id.* at *10 (quoting *Bruh* v. *Bessemer Venture Partners III LP*, 464 F.3d 202, 214 (2d Cir. 2006) (emphasis in original)).

The district court's analysis in *Chechele* v. *Sperling* is similarly informative. 2012 WL 1038653. In that case, the plaintiff ("Chechele") brought a complaint against defendants John and Peter Sperling (together, the "Sperlings") and nominal defendant Apollo Group, Inc. ("Apollo"), seeking disgorgement of alleged short-swing profits realized by the Sperlings via five forward sale agreements for Apollo stock. *Id.* at *1. The Sperlings moved to dismiss Chechele's complaint, and the court granted their motion. *Id.* As in

27

*Murdock*, the court attributed significant weight to the extent to which the Sperlings could have manipulated the terms of the transactions at the time of their execution.  *Id.* at *4.  Under the forward sale agreements, "the number of shares to be sold" in the transactions depended on formulas "set two to three years earlier, when the Sperlings entered into the agreements."  *Id.* at *5.  The court accordingly reasoned that the Sperlings "had no opportunity to speculate on the basis of their inside information" at the time of the transactions because the terms had been set years prior, and thus the Sperlings could not be liable under Section 16(b).  *Id.*  In both *Murdock* and *Sperling*, the courts emphasized that the terms governing the settlement of the transactions at issue had been established sufficiently ahead of the execution of those transactions such that the risk of insider speculation was abated.

Turning to the facts of the instant case, the Court finds it appropriate to adopt the second approach to determining the applicability of Section 16(b). Similar to the cases discussed above, the Court finds that the *Kern County* approach does not apply here, in view of the fact that Defendant is clearly a "garden-variety" insider.  *At Home*, 446 F.3d at 408.  As Y-mAbs' founder, interim CEO, Head of Business Development, and President, Defendant plainly had access to non-public information that could be exploited for financial gain (Def. 56.1 ¶¶ 1-2); moreover, Defendant voluntarily exchanged Y-mAbs shares, reporting those sales to the SEC (Pl. 56.1 ¶ 28).  *Compare id.* (declaring *Kern Country* defendant an "atypical insider" because it "lacked access to inside information" and "its shares w[ere] sold involuntarily"), *with id.* at 407-08

28

(identifying defendant as a "garden-variety" insider because defendant acquired three cable companies that held warrants to purchase shares from plaintiff, "[effectively] placing those warrants in [defendant's] hands").

Accordingly, the question before the Court is whether the March 2021 Transaction presented a risk of insider speculation so as to fall within the scope of Section 16(b)'s strict liability. As discussed above, the answer to this question turns on whether Defendant, as an insider, could have manipulated the terms of the March 2021 Transaction, at the time of the settlement of the transaction, to be more favorable to him, on account of his access to inside information. Based on the record now before it, the Court finds that Defendant could not have done so, and thus is not liable under Section 16(b).

Several facts support the Court's conclusion that the terms of the March 2021 Transaction could not have been manipulated by Defendant at the time of the settlement of the transaction. *First*, the March 2021 Transaction provided for GAD Enterprises' repayment of the WB Loan from Weco Biotech (Def. 56.1 ¶ 77), which loan formed part of the initial Shareholders' Agreement between the parties. (*Id.* ¶ 39). The terms of the Shareholders' Agreement, which was executed in 2015, governed how the WB Loan could and ultimately would be repaid to Weco Biotech in March 2021. (*Id.* ¶ 77). That is, the fact that GAD Enterprises received 1,029,927 shares rather than 1,030,356 shares of Y-mAbs common stock in the March 2021 Transaction was a byproduct of the Shareholders' Agreement, not the Exchange Agreement. (*Id.*). Further, neither party has suggested that the terms of the WB Loan could be renegotiated by

29

either GAD Enterprises or Weco Biotech. Accordingly, as a baseline matter, Defendant had no ability to manipulate the terms pertaining to the WB Loan at the time of the March 2021 Transaction.

*Second*, the terms governing the July 2019 Transaction, which were materially identical to the terms governing the March 2021 Transaction, were decided upon by JWW and Myhrmann, absent any involvement or input from Defendant, two years prior to the March 2021 Transaction. (*See* Def. 56.1 ¶ 58; Asaro Decl., Ex. 4 (Myhrmann Deposition Transcript) at 31:19-38:25 (stating that Defendant had neither "control" over JWW and Myhrmann's decision to initiate the July 2019 Transaction or the March 2021 Transaction, nor any role in "structuring the transactions and exchanges")). Plaintiff emphasizes (and Defendant does not dispute) that Defendant willingly entered into the Exchange Agreement. (Pl. 56.1 ¶ 24; Def. Counter-56.1 ¶ 24). But Plaintiff also acknowledges that the July 2019 Transaction and the March 2021 Transaction were executed "on the same material terms" as each other (Def. 56.1 ¶ 75; *see also* Pl. Counter-56.1 ¶¶ 74-75), and that Defendant had no involvement in the decision to remove non-JWW controlled entities from WG Biotech's ownership (Def. 56.1 ¶ 58; Pl. Counter-56.1 ¶ 58.1). Plaintiff's assertion that Defendant was able to negotiate the terms of the March 2021 Transaction (Pl. Counter-56.1 ¶ 75) is thus unpersuasive.

More specifically, the terms of the July 2019 Transaction and the March 2021 Transaction align insofar as, pursuant to both, each share of WG Biotech was exchanged for approximately 50.1 shares of Y-mAbs common stock. (Def.

SPA-31

56.1 ¶¶ 74, 81). While there was not a forward sale or purchase agreement in place specifying the price of Y-mAbs common stock in any future settlement, as in *Murdock* and *Sperling*, both the 2019 and 2021 Transactions exchanged Y-mAbs common stock for WG Biotech at exactly the same rate, *i.e.*, 50.1 shares of Y-mAbs common stock per one share of WG Biotech. (Def. 56.1 ¶¶ 74, 81; Def. Opp. 11). As Plaintiff admits, this rate "depicted the proportional interest of WG Biotech shareholders in the Y-mAbs shares constituting WG Biotech's only asset at a ratio of 50.1 to 1 — *i.e.*, 50.1 Y-mAbs shares were designated as corresponding to each WG Biotech share." (Pl. Br. 2).

What is more, this rate was reflected in WG Biotech's 2015 Shareholder Register and remained consistent at all relevant times. (*See* Asaro Decl., Ex. 5 (Share Registers for WG Biotech dated December 31, 2015; December 31, 2016; December 31, 2017; December 31, 2018; and March 2019); *see also* Pl. Br. 2-3 (stating that in May 2019, JWW bought out the interests of WG Biotech's minority shareholders at a ratio of 50.1:1 — "the same ratio depicted on the WG Biotech Shareholder Registers"), 3-4 (stating that the March 2021 Transaction involved an exchange "reflecting the same 50.1:1 ratio at which the Smallholders had previously exchanged their WG Biotech shares for Y-mAbs shares[.]")). The logical inference is that the share exchange rate for the March 2021 Transaction was predetermined by JWW, without involvement or input from Defendant. In other words, the March 2021 Transaction was governed by

31

SPA-32

the 50.1:1 ratio, which was set in 2015, and not the $35.30 closing Y-mAbs share price.[12]

Third, while the Exchange Agreement was signed by Defendant voluntarily and shortly before the March 2021 Transaction was executed, certain provisions of the Exchange Agreement evince that Defendant was not in a position to benefit from insider speculation. In particular, the Court notes that the dollar value of Y-mAbs shares was excluded from the terms of the Exchange Agreement. That is, the Exchange Agreement makes no mention of the price at which the shares of WG Biotech would be traded for the shares of Y-mAbs other than briefly referencing the then-current value per share of Y-mAbs as of the signing of the Exchange Agreement. (Gad Decl., Ex. 6 (Exchange Agreement) at 1).

Plaintiff's arguments for finding the March 2021 Transaction to be a qualifying "purchase" are unavailing. As a threshold matter, Plaintiff's opening brief in support of his motion for summary judgment assumed that the March 2021 Transaction was indisputably a "purchase," analyzing only what date should be used as the date on which Defendant's Section 16(b) "purchase" occurred. (Pl. Br. 9 (citing Blau v. Ogsbury, 210 F.2d 426, 427 (2d Cir. 1954))).

---

[12]    On this point, as WG Biotech's Form 4 reporting the July 2019 Transaction makes clear, certain shareholders of WG Biotech exchanged 10,781 shares of WG Biotech for 540,105 shares of Y-mAbs common stock. (See Tauber Aff., Ex. 8). Accordingly, in that transaction, every share of WG Biotech was worth 50.1 shares of Y-mAbs, and yet the closing sale price of Y-mAbs common stock at the time of the July 2019 Transaction was $22.95. (See id.). In the March 2021 Transaction, Defendant also exchanged his WG Biotech shares for Y-mAbs shares at a 50.1 to 1 ratio, yet the closing price of Y-mAbs stock at the time of that transaction was $35.30. (See Gad Decl., Ex. 3C at 3).

SPA-33

In so doing, Plaintiff eschewed any analysis as to congressional intent, and, for that matter, ignored *Kern County* and its progeny entirely. (*Id.* at 8-9).

Plaintiff first argued that the March 2021 Transaction is a "purchase" under Section 16(b) in his brief in opposition to Defendant's motion for summary judgment. (Pl. Opp. 10-12). There, Plaintiff contends that the borderline transaction exception does not apply to the March 2021 Transaction because, in Plaintiff's view, the March 2021 Transaction is not sufficiently "unorthodox"; in support, Plaintiff argues that the March 2021 Transaction was voluntary, and that Defendant was not an "atypical insider." (Pl. Opp. 12). However, as discussed above, the Court need not find that both *Kern County* criteria are present to engage in a congressional-intent-based analysis of whether the transaction at issue lends itself to insider abuse of access to inside information. The Court thus rejects Plaintiff's argument.

Plaintiff also argues that the March 2021 Transaction is a Section 16(b) "purchase" because "Gad voluntarily agreed to sell his WG Biotech shares in exchange for Y-mAbs shares and he negotiated the timing and terms of that exchange." (Pl. Reply 9). However, for the reasons described above, the record does not reflect any ability on the part of Defendant to negotiate (much less any actual negotiation of) the terms of the March 2021 Transaction; to that end, the Court has no reason to believe that JWW would have agreed to execute the March 2021 Transaction upon any terms other than those JWW dictated. Further, the simple fact that Defendant agreed to execute the March 2021 Transaction does not endow him with the "opportunity to speculate on the

33

SPA-34

basis of [his] inside information." *Sperling*, 2012 WL 1038653, at \*5. Accordingly, the Court is unmoved by Plaintiff's argument.

Ultimately, because Defendant could not have manipulated the terms of the March 2021 Transaction to be more favorable to him, the Court finds that that the March 2021 Transaction was not a "purchase" under Section 16(b). Classifying the March 2021 Transaction as a "purchase" would not "serve[] the congressional purpose of curbing short-swing speculation by corporate insiders," as, in agreeing to the March 2021 Transaction, Defendant was unable to exploit any inside information he possessed. *Gibbons*, 703 F.3d at 601 (internal quotation marks omitted). In other words, Defendant was not in a position to perpetuate "the evil which Congress sought to prevent [with Section 16(b)]." *Kern*, 411 U.S. at 594. Accordingly, the Court finds that Section 16(b) liability does not attach to Defendant for the challenged transactions, and grants summary judgment in favor of Defendant.

### 2. Defendant Is Exempted from Liability by Operation of SEC Rule 16a-13 Because Defendant Remained a Beneficial Owner of the Y-mAbs Stock[13]

In addition to the whether the March 2021 Transaction constituted a "purchase" for Section 16(b) purposes, the parties also dispute whether the March 2021 Transaction is exempt from Section 16(b) liability pursuant to SEC

---

[13]   In Plaintiff's motion for summary judgment, Plaintiff argues that the March 2021 Transaction is not exempt under SEC Rule 16a-9(b), which renders exempt transactions, in relevant part, that result in "[t]he acquisition of rights ... pursuant to a pro rata grant to all holders of the same class of equity securities[.]"  17 C.F.R. § 240.16a-9(b).  While Defendant cited the Rule 16a-9(b) exemption in his Answer as an affirmative defense to Section 16(b) liability (Gad Answer ¶ 24), the Court does not address this exemption here because Defendant does not argue its applicability in his motion for summary judgment (*see generally* Def. Br.).

SPA-35

Rule 16a-13. (*See, e.g.*, Pl. Br. 18-19; Def. Br. 20). For the reasons set forth below, the Court finds that Defendant is exempt from Section 16(b) liability under Rule 16a-13 because he retained beneficial ownership of and pecuniary interest in his holdings of Y-mAbs common stock both before and after the March 2021 Transaction.

    As previously noted, Rule 16a-13 exempts from Section 16(b) liability any acquisition that effects "only a change in the form of beneficial ownership without changing a person's pecuniary interest in the subject equity securities" (the "16a-13 Exemption"). (Def. Br. 20 (quoting 17 C.F.R. § 240.16a-13)).[14] "Rule 16a-1, the SEC regulation implementing Section 16(b), defines 'beneficial owner' as 'any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities[.]'"[15] *Donoghue* v. *Smith*,

---

[14]    As Plaintiff reminds the Court (*see* Pl. Br. 17), in August 2022, the Court denied Defendant's motion to dismiss on the basis that

> Defendant's argument under Rule 16a-13 relies almost exclusively on documents that the Court cannot consider in resolving his motion. For example, to support his claim that "[a]ll shares of Y-mAbs common stock held by WG Biotech were earmarked" for each investor in WG Biotech, Defendant cites to the Shareholder Registers. Similarly, as evidence of the purported fact that "GAD Enterprises had the unfettered right to receive its *pro rata* portion of the proceeds from any sale of the Y-mAbs shares held by WG Biotech[,]" Defendant again points to the Shareholder Registers, as well as the Shareholders Agreement. Neither of these documents, however, is properly before the Court, and thus the Court cannot find that Defendant had an indirect pecuniary interest in the Y-mAbs shares based on those records.

(Dkt. #37 at 19-20 (citations omitted)). Because the Court is now able to consider these documents in resolving the instant motion, it is able to "find that Defendant had an indirect pecuniary interest in the Y-mAbs shares based on those records." (*Id.*).

[15]    Technically, there are two definitions of "beneficial owner" under SEC regulations. The first definition is utilized to determine who is a ten-percent beneficial owner, and therefore a statutory insider. 17 C.F.R. § 240.16a-1(a)(1). The second definition, which

SPA-36

No. 21 Civ. 4811 (JMF), 2022 WL 1225338, at *4 (S.D.N.Y. Apr. 26, 2022) (citations omitted) (quoting *Feder* v. *Frost*, 220 F.3d 29, 33 (2d Cir. 2000)). Relatedly, Rule 16a-1 defines "pecuniary interest" as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a-1(a)(2)(i).

Because Rule 16a-13 does not itself provide guidance as to what kinds of transactions qualify for the 16a-13 Exemption — *i.e.*, circumstances in which a shareholder retained his beneficial interest in a security before and after a particular transaction — courts in this District have sought guidance elsewhere. Some courts have looked to industry treatises for direction. *See, e.g.*, *Chechele* v. *Standard General L.P.*, No. 20 Civ. 3177 (KPF), 2021 WL 2853438, at *8 (S.D.N.Y. July 8, 2021) (citing PETER J. ROMEO & ALAN L. DYE, SECTION 16 DESKBOOK 96 (Winter 2012) (hereinafter, "Romeo & Dye") at 300 (referring to "(i) a distribution of shares from a trust to an insider-beneficiary of the trust and (ii) a distribution of securities from a limited partnership to its general partner" as situations where the 16a-13 Exemption applies)); *Smith*, 2022 WL 1225338, at *4 (citing Romeo & Dye at 553-54 (indicating that changes from indirect to direct ownership constitute changes in the form of a party's beneficial ownership, but do not change the party's pecuniary interest,

---

applies for purposes of the short-swing profits provisions of Section 16(b), provides that the term "beneficial owner" means "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities[.]" *Id.* § 240.16a-1(a)(2). Because the parties do not dispute that Defendant was an insider, only the second definition is relevant to the instant matter. (*See* Def. Br. 20 & n.7; Pl. Br. 17-18).

SPA-37

and as such, qualify for the 16a-13 Exemption)).  Courts have also found persuasive certain SEC publications.  *See, e.g.*, *Standard General*, 2021 WL 2853438, at *8 (quoting *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Releases Nos. 34-37260, 35-26524, 61 Fed. Reg. 30376, 30385 n.117 (June 14, 1996) (hereinafter, "*Ownership Reports and Trading by Officers*")); *Smith*, 2022 WL 1225338, at *4 (same).

A brief review of cases in which courts have addressed the applicability of the 16a-13 Exemption is also informative.  Broadly speaking, where a transaction merely changes a holder's "form of beneficial ownership" but does not change the holder's pecuniary interest in the subject securities, courts have concluded that the transaction qualifies for the 16a-13 Exception.  *See, e.g.*, *Smith*, 2022 WL 1225338, at *4; *Donoghue* v. *Novastar Fin. Inc.*, No. 04 Civ. 6857 (KMW), Dkt. #33 at 23 (S.D.N.Y. Mar. 27, 2006) (indicating that defendant's transfer of shares from joint account to personal account qualified for 16a-13 Exemption).  For instance, courts in this District have found that "distributions of equity securities from an employee benefit plan to an insider participant" qualify for the 16a-13 Exemption, in view of the fact that they involve "a mere change in the form of beneficial ownership from indirect to direct where the securities previously had been attributed to the insider."  *See, e.g.*, *Smith*, 2022 WL 1225338, at *4; *Standard General*, 2021 WL 2853438, at *8.

SPA-38

Conversely, where a transaction implicates a change in both a holder's form of beneficial ownership and pecuniary interest, courts have concluded that the 16a-13 Exception does not apply. For example, in *Chechele* v. *Standard General L.P.*, the defendants conducted a series of transactions "separately and independently of one another, at slightly different times, [] with different counterparties." 2021 WL 2853438, at *9 (internal quotation marks omitted) (alteration in original). The Court held that the plaintiff had plausibly pleaded that the defendants' pecuniary interests changed over the course of these transactions, due to the existence of gaps in time between the transactions in which defendants "had neither direct nor indirect beneficial ownership over the stock." *Id.* at *10. In another case, *Donoghue* v. *Novastar Financial Inc.*, the defendant purchased a certain number of a company's shares through one account and subsequently sold the same number of that company's shares out of another account; the court found that these transactions, unlike transferring the same shares directly between the two accounts, did not reflect a "mere change in the form of ownership of the securities involved," thus rendering the 16a-13 Exemption inapplicable. No. 04 Civ. 6857 (KMW), Dkt. #33 at 22-23.

Here, it is undisputed that Defendant had a pecuniary interest in his holdings of Y-mAbs common stock following the March 2021 Transaction. (*See* Def. Br. 2-3 (arguing that the March 2021 Transaction "simply brought about a change in the form of [Defendant's] beneficial ownership of the securities … leaving his pecuniary interest unchanged"); Pl. Br. 18-19 (arguing that

38

SPA-39

Defendant's pecuniary interest in the Y-mAbs stock is governed by SEC Rule 16a-1(a)(2)(iii) and thus that Defendant only had a pecuniary interest in the Y-mAbs stock after the March 2021 Transaction)).  The availability of the 16a-13 Exemption accordingly depends on whether Defendant had a pecuniary interest in the Y-mAbs securities he held indirectly through WG Biotech — "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in [those Y-mAbs] securities" — between 2015, the date of his initial investment, and the March 2021 Transaction.  *Standard General*, 2021 WL 2853438, at *9 (quoting 17 C.F.R. § 240.16a-1(a)(2)(i)).

The Court finds that Defendant could indeed "profit or share in any profit derived from a transaction in [the Y-mAbs] securities [that he held through WG Biotech]" since 2015, and thus that he had a pecuniary interest in those Y-mAbs shares before and after the March 2021 Transaction, making the transaction eligible for the 16a-13 Exemption.  17 C.F.R. § 240.16a-1(a)(2)(i). First, taking the Shareholders' Agreement at face value, Defendant was entitled to profits from Y-mAbs shares held by WG Biotech from 2015, when the Shareholders' Agreement was executed, through the March 2021 Transaction, when WG Biotech no longer held any Y-mAbs shares.  (*See* SA ¶ 16.1).  More specifically, Defendant (through GAD Enterprises) was entitled to 100% of the *pro rata* portion of the proceeds from any sale of Y-mAbs shares by WG Biotech.  (Def. 56.1 ¶ 27; Pl. Counter-56.1 ¶ 27).  Further, Defendant (again, through GAD Enterprises) had the ability to demand distribution of 33.33% of any dividends Y-mAbs paid to WG Biotech.  (Def. 56.1 ¶ 25; Pl. Counter-56.1

SPA-40

¶ 25; SA ¶ 16.1).  While Y-mAbs never paid any dividends to WG Biotech, this does not change the fact that Defendant was entitled to the contracted-for portion of those dividends; Plaintiff acknowledges as much.  (Def. 56.1 ¶ 26; Pl. Counter-56.1 ¶ 26).  These provisions of the Shareholders' Agreement alone bestow on Defendant a pecuniary interest in the Y-mAbs shares extending back to 2015.

Beyond the plain text of the Shareholders' Agreement, the relevant caselaw in this District supports the Court's conclusion as well.  As the Romeo & Dye treatise indicates, and as several courts in this District have found, "a distribution of shares from a trust to an insider-beneficiary of the trust" constitutes an exempt transaction under Rule 16a-13.  *Standard General*, 2021 WL 2853438, at *8 (citing Romeo & Dye at 300).  Much like a beneficiary of a trust benefits from profits realized by the trust through the trust's investments, Defendant here was entitled to benefit from profits realized by WG Biotech from its sale of Y-mAbs common shares and from Y-mAbs dividends.  (Def. 56 ¶¶ 25, 27).  Similarly, Defendant's continued entitlement to profits realized from Y-mAbs shares held by WG Biotech resembles "distributions of equity securities from an employee benefit plan to an insider participant … where the securities previously had been attributed to the insider."  *Smith*, 2022 WL 1225338, at *4; *see also Standard General*, 2021 WL 2853438, at *8 (both quoting *Ownership Reports and Trading by Officers*).  The Y-mAbs shares held by WG Biotech were specifically attributed on a *pro rata*

40

SPA-41

basis to each of WG Biotech's investors, including GAD Enterprises.  (Def. 56.1 ¶ 41).

Above all, this Court is guided by the principle that "a mere change in the form of beneficial ownership from indirect to direct where the securities previously had been attributed to the insider" qualifies for the 16a-13 Exemption.  *See Smith*, 2022 WL 1225338, at *4; *Standard General*, 2021 WL 2853438, at *8; *see also Novastar*, No. 04 Civ. 6857 (KMW), Dkt. #33 at 22-23 (noting that, if the defendant had "simply moved [] shares from his joint account to his [individually controlled] accounts," the transaction would likely be exempt under Rule 16a-13).  Applying that logic to the instant case, Defendant effectively moved his Y-mAbs shares from one account to another when he transferred them from indirect ownership through WG Biotech shares to direct ownership through GAD Enterprises.  The facts of the instant matter fit comfortably within the contours of this District's articulation of the 16a-13 Exemption.

Plaintiff argues, in opposition, that SEC Rule 16a-1(a)(2)(iii) forecloses Defendant from taking advantage of the 16a-13 Exemption.  (Pl. Opp. 18). That rule provides in relevant part that

> [a] shareholder shall not be deemed to have a pecuniary interest in the portfolio securities held by a corporation or similar entity in which the person owns securities if the shareholder is not a controlling shareholder of the entity and does not have or share investment control over the entity's portfolio[.]

41

SPA-42

17 C.F.R. 240.16a-1(a)(2)(iii).  The Court is not convinced that this Rule is applicable to the instant case.[16]  Importantly, the Second Circuit has indicated that an insider "hav[ing] or shar[ing] investment control" refers to "a shareholder with the power to exercise control over the corporation by virtue of his or her securities holdings."  *Feder*, 220 F.3d at 34; *see also Mercer* v. *Gupta*, 880 F. Supp. 2d 486, 493 (S.D.N.Y. 2012) (defining investment control as "possessing the direct or indirect power to direct or cause the direction of the management and policies of a person's (or fund's) investments").  Here, certain provisions of the Shareholders' Agreement suggest that Defendant had some at least some substantive investment control over WG Biotech's portfolio. For example:

- Any agreement made "between [WG Biotech], on one side[,] and one or more of the parties or anyone closely related on the other side, ... always [had to] be approved by the other party."  (SA ¶ 7.1).

- Either JWW or Defendant was "entitled to transfer its shares in entirety or in parts," but each was required to first offer those shares to the second party in writing, detailing the price offered by a third party to the selling party.  (SA ¶ 8.1).  If the second party did not respond to the selling party within one month of receiving the offer, the selling party could "sell their capital shares to a third party ... within the range of +/- 10%" of the original price offered by such a third party.  (*Id.*).

- If either JWW or Defendant had "the option of selling all or parts of their capital shares to an independent third party, the other party ha[d] the right to demand[] that

---

[16]   As Defendant notes, "this rule was adopted as a safe harbor, and not as a definition of pecuniary interest, and in any event, must be raised by a defendant since it is an affirmative defense."  (Def. Opp. 18-19 (first citing *Feder ex rel. Ivax Corp.* v. *Frost*, 220 F.3d 29, 33 (2d Cir. 2000); and then citing *Mercer* v. *Gupta*, 712 F.3d 756, 759 (2d Cir. 2013))).

SPA-43

the third party also buys a proportionate part of th[at] [second] party's capital shares on identical terms." (SA ¶ 10.1). If the third party was not interested in acquiring the second party's shares, "the selling capital owner [had to] cancel the sale of their capital shares." (*Id.*).

▪ The Shareholders' Agreement was "irrevocable by both parties and remain[ed] unchanged in force until there [was] an agreement between the parties to terminate or amend it, or until a party becomes the owner of all the shares." (SA ¶ 18.1).

Taken together, these provisions indicate that JWW and Defendant had significant oversight over each other with respect to how their capital shares of each other's companies could be transferred or otherwise allocated from the execution of the Shareholders' Agreement through the March 2021 Transaction. While Defendant was not involved in JWW's decision to undertake the July 2019 and March 2021 Transactions, by virtue of the fact that Defendant did not control WG Biotech (*see* Pl. 56.1 ¶ 8; Def. Counter-56.1 ¶ 8), the terms of the Shareholders' Agreement put Defendant on the same playing field as JWW with respect to Defendant's control over his Y-mAbs shares while the Shareholders' Agreement remained in effect (*see* SA ¶¶ 7-10 (outlining terms to which both parties were bound with respect to transferring or otherwise disposing of Y-mAbs shares)); *see also supra* Background Section B.2 (listing examples of these terms)). The governing terms of the Shareholders' Agreement indicate that Defendant had, if not the "direct power," at the very least, the "indirect power to direct or cause the direction of the

43

SPA-44

management" of WG Biotech's investments in Y-mAbs.  *Mercer*, 880 F. Supp. 2d at 493.

For all of these reasons, the Court finds that the 16a-13 Exemption applies to the March 2021 Transaction, and that Section 16(b) liability does not attach to Defendant's trades in the six-month periods preceding and following that transaction.  The 16a-13 Exemption thus provides a separate basis upon which this Court may grant Defendant's motion for summary judgment.

## CONCLUSION

For the reasons detailed above, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for the same.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    August 5, 2024
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

44

SPA-45

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
DENNIS J. DONOGHUE,

                   Plaintiff,

         -v-

Y-MABS THERAPEUTICS, INC.,

                   Nominal Defendant,

         -and-                                 21 **CIVIL** 7182 (KPF)

                                              <u>**JUDGMENT**</u>

THOMAS GAD,

                   Defendant.
-----------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated August 5, 2024, Defendant's motion for summary

judgment is GRANTED and Plaintiff's motion for the same is DENIED; accordingly, the case is

closed.

**Dated:**  New York, New York

       August 5, 2024

                                      **DANIEL ORTIZ**
                                ————————————————
                                **Acting Clerk of Court**
          **BY:**               K. Mango
                                ————————————————
                                     **Deputy Clerk**